704 A.2d 988

JOSEPHINE C. HIGGINS AND JOSEPH A. HIGGINS, JR., PLAIN-
TIFFS–RESPONDENTS/CROSS–APPELLANTS, v. PASCACK
VALLEY HOSPITAL, DOROTHY VOORMAN–FISH, GARY DEL
MORO, MYRON HOROWITZ, LOUIS YCRE, AND DANIEL DE-
SANTIS, DEFENDANTS–APPELLANTS/CROSS–RESPON-
DENTS.

Superior Court of New Jersey
Appellate Division

Argued December 16, 1997—Decided January 14, 1998.

278

Before Judges CONLEY, WALLACE and CARCHMAN.

*John H. Schmidt, Jr.* argued the cause for appellants/cross-respondents (*Lindabury, McCormick & Estabrook,* attorneys; *Mr. Schmidt,* and *Athena Lekas,* on the brief).

*Andrew Dwyer* argued the cause for respondents/cross-appellants (*Reinhardt & Schachter,* attorneys; *Paul Schachter,* of counsel and on the brief; *Mr. Dwyer,* on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiff, Josephine Higgins, was a part-time nurse for Pascack Valley Hospital's mobile emergency-care squad. In 1991 and 1992 she complained to her supervisors on two occasions about what she believed to be misconduct by a co-employee. The supervisors

investigated both complaints and concluded that the co-employee had not engaged in the alleged misconduct. As a result of her complaints, however, other co-employees became hostile towards plaintiff and expressed to their supervisors the desire not to be assigned to work with her. In her subsequent civil action, plaintiff contended that as a result, her work hours were reduced and her request for transfer to the full-time position of a mobile intensive care nurse was denied in retaliation for her complaints and, thus, in violation of the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. She also claimed that defendants defamed her. Defendants appeal a jury verdict returned in favor of plaintiff on both claims, awarding her compensatory and punitive damages of $640,000 (reduced to $619,000 on remittitur), plus $200,816.77 counsel fees, $11,884.85 in costs, and $26,082 prejudgment interest. Plaintiff cross-appeals from the remittitur, the calculation of counsel fees, and the dismissal of her complaint against the individual defendants as to their personal liability.

On defendants' appeal, we reverse the verdict as to defamation, agreeing with defendants that a cause of action on that theory was not, as a matter of law, established by plaintiff. Because we believe the jury charge as to the CEPA claim was erroneous, we reverse the verdict as to that claim and remand for a new trial thereon. We do so not only as to liability but damages as well because we think the award of compensatory and punitive damages can not be separated from the liability issues.

As to the issues on cross-appeal, our reversal of the CEPA and defamation liability verdicts renders the remittitur and counsel fee issues moot. We are convinced the trial judge, for the reasons she expressed, properly dismissed the complaint as to the individual defendants and that, further, the issues on appeal as to that dismissal are without merit and require no further opinion. *R.* 2:11–3(e)(1)(A), (E).

*I*

In 1985, plaintiff began working for the hospital as a part-time nurse in its Mobile Intensive Care Unit (MICU). The unit

responds to accident scenes with a nurse and a paramedic, who provide emergency treatment to injured victims and ride in the ambulance with the victims until arrival at the hospital. Plaintiff's employment status was known as "per diem-unscheduled." During her years with the hospital, plaintiff also worked part-time elsewhere as a nurse or nursing instructor. Her complaint originates from two separate incidents involving two separate calls. The parties have referred to the first incident as "the paperwork incident" and the second as the "pill-theft incident."

A.

### The paperwork incident

After completing an MICU call, the nurse and paramedic are required to fill out either a white or a blue sheet. A white sheet is used when the MICU arrived at the scene and provided some assessment or treatment. A blue sheet is used if the MICU call was canceled by the police or ambulance staff before the MICU arrived.

Plaintiff testified that in the fall of 1991 two MICU nurses had been suspended for filing a blue sheet for an incident in which they had actually seen the victim; they should have filled out a white sheet instead. Shortly thereafter the MICU coordinator held a meeting at which he reminded the staff of the importance of the necessity for proper paperwork.

About two months later, on November 18, 1991, plaintiff was serving as a volunteer for Triboro Volunteer Ambulance Corps when an ambulance was dispatched to the home of two firemen, father and son, who had been injured during a drill. Plaintiff knew the son, Kenny Steele, whom she began treating for smoke inhalation. Also reporting to the scene was an MICU vehicle manned by two paramedics, Bruce Contini and Peter Fromm. Plaintiff saw them evaluating Kenny. Plaintiff's ambulance then transported Steele to the hospital.

The next time plaintiff reported for MICU duty, about a week later, she checked the MICU log to find out what had happened to Steele. The log indicated that the MICU call had been canceled before Contini and Fromm ever got to the scene. As a result, plaintiff formed the opinion that the paperwork she found was incomplete, and that the paramedics had failed to complete the appropriate forms.

At trial Fromm gave his version of the incident. He and Contini were dispatched to attend to a patient with a respiratory emergency. While they were en route to the scene, they received a second dispatch that there was a second patient needing attention at the same location. Upon their arrival either some police officers or the ambulance staff told them that the second patient did not need their assistance; hence, they treated Kenny Steele, who was suffering from smoke inhalation. Plaintiff had already arrived with the ambulance and was with Steele. Fromm and plaintiff agreed that Steele did not need the advanced life support offered by the MICU, and so they left Steele with the ambulance squad.

On the way back to the hospital, Contini filled out a blue sheet with regard to the second patient, Kenny Steele's father, whom they had not attended to. Contini wrote "Resp" (respiratory) in the space for the purpose of the dispatch, because that had been the subject of the initial dispatch. In the section labeled "CANCELED PRIOR TO ARRIVAL," Contini first wrote in "BLS" (basic life support, a reference to the ambulance squad), but then crossed it out and wrote "error" when he realized that he should have filled out the next section, for calls canceled "UPON ARRIVAL." Fromm reviewed the blue sheet, signed it, and gave it back to Contini.

According to Fromm he filled out a white sheet for the incident, describing his and Contini's treatment of Kenny Steele for smoke inhalation. In the top right-hand corner, in the space for "Report # ," Fromm wrote "91–" but left the rest of the number blank because he was in the emergency room and the log book with the

incident numbers was in the office. Instead of putting the form in the coordinator's box for his signature, Fromm said he inadvertently left it in the emergency room where they had taken Steele.

In his deposition (read into evidence because Contini had moved to Colorado before trial), Contini substantially corroborated Fromm's account of how he and Fromm had been "called off" the second patient and examined Kenny Steele only. Contini filled out a blue sheet on the second patient, at first filling in the wrong section but finally indicating that the second call had been canceled on arrival by the ambulance team. He said that he had told plaintiff that the form had been properly completed. Plaintiff, however, testified that Contini told her the white sheet had been made up after she reported the incident.

Plaintiff reported the suspected impropriety to her supervisor, defendant Gary Del Moro, Coordinator and Assistant Director of the MICU. He told her that he would investigate and get back to her. Del Moro testified at trial that upon receiving plaintiff's complaint, he called Fromm, told him of her complaint and asked him if he had completed the proper forms. Fromm told him he had. Del Moro also advised Dorothy Voorman–Fish, the President of Nursing Services, of the potential infraction. The next morning Del Moro investigated the complaint. As he began his investigation, he located only the blue sheet. He then telephoned the dispatching agency, and confirmed that the dispatch was for two people, one who had respiratory problems and one who fell. Since Del Moro could not locate the white sheet in the MICU office or the emergency room, he went to the medical records department at the hospital to look through the patient charts. Inside of the patient's medical record was the white sheet. Although the dispatch report number was missing, the white sheet was otherwise complete. The missing dispatch number was later filled in by Nancy Del Moro, a full-time MICU nurse (and Gary Del Moro's wife), on November 8, 1992, nearly a year later.[1]

---

[1] When asked about the one year delay, Fromm testified:

Del Moro made a written report of the accusation and what his investigation revealed to Voorman–Fish. Thereafter, Voorman–Fish reviewed six months of MICU incident reports to make certain the hospital policies were being followed. Plaintiff was made aware of Del Moro's findings and claimed to have been chastised for making the report. Plaintiff was not disciplined for making the accusations against Fromm and Contini, but Del Moro wrote in his December 7, 1991 report to Voorman–Fish:

> Josephine's actions have markedly polarized this MICU. Several staff have refused to work with her, [o]thers have elected to confront her. My clinical evaluation of Josephine is that of an employee that meets expectations, however, this type of unsubstantiated accusations in addition to Josephine's history of not following the chain of command make her a less than desirable employee.

Following the incident, both Fromm and Contini wrote to Del Moro requesting that they no longer be scheduled to work with plaintiff. During his deposition, Contini expressed his opinion that plaintiff was not a good MICU employee, claiming she had poor communication skills and a lack of direction in treating patients. He felt his opinion was shared by other employees in the MICU.

## B.

### The pill-theft incident

On January 15, 1992, plaintiff and Fromm were dispatched to aid someone experiencing chest pain. Plaintiff was standing on one side of the patient's bed and Fromm on the other, when plaintiff saw Fromm open the patient's bottle of pills, empty them into his left hand and place them in his pocket. Plaintiff was very upset, never having seen such conduct. Though there were police

---

A. Well, the log book was amended immediately upon discovery of the error. Nobody bothered to put it on the form. And [sic] accusation had been made, and I think that the form was kept by the coordinator until that whole thing was resolved. So I didn't access—let me back up. The chart was never given to me so that I could fix it.

Q. So the number was added after the accusation was made?

A. Yes.

present, plaintiff did not say anything at the time because "I was taking care of my patient and I was trying to think through what I had just seen." Upon arrival at the hospital, plaintiff called her nursing supervisor, Linda Sacchieri. Sacchieri told her to return to work and that she would "handle the situation."

The hospital has specific policies and procedures to follow in connection with allegations of an employee's drug abuse or unlawful activities. Sacchieri testified at trial that immediately after plaintiff's report, she contacted Voorman–Fish for advice. After talking to Voorman–Fish, Sacchieri immediately took Fromm into her office. She and another supervisor questioned him about the alleged theft of medication, and made him empty his pockets. This was audio-taped. Fromm denied taking drugs and had nothing in his pockets.

The next morning, Voorman–Fish directed Del Moro to contact the Paramus police and volunteer ambulance squad and try and get statements. Voorman–Fish also reviewed the MICU incident report, the white sheet, and particularly focused on the drugs that were listed as the patient's medications.

That same morning Voorman–Fish also telephoned plaintiff and asked her to document the incident and submit that in writing to her by 5:00 p.m. that day. Later that same day, plaintiff telephoned Voorman–Fish and told her that she would not submit anything until she could speak with her attorney. Because Voorman–Fish had not received anything in writing from plaintiff on January 15, 1992 she wrote to plaintiff on January 16, 1992 and chastised her for not responding. In fact, plaintiff did respond to Voorman–Fish; the letter was dated January 16, 1992 and was found on a desk in the nursing office on January 17, 1992.

In response to Voorman–Fish's directions, Del Moro did contact the Paramus police and the ambulance squad that responded with plaintiff and Fromm on January 15, 1992. He found no information to corroborate what plaintiff had reported.

At trial Fromm denied plaintiff's theft accusation. He explained that he opened the patient's prescription bottles and emptied their contents into his hand in order to determine if the patient had taken too many or not enough pills, which he could determine by looking at the dates on the bottles and then counting the number of pills remaining. He opined that it "would have been irresponsible" of him not to examine the patient's medications. Fromm then poured the pills back into their bottles and replaced the lids; he denied putting any pills in his pockets.

Following its investigation of plaintiff's allegations, the hospital concluded that Fromm did not steal prescription medications from the Paramus residence. Although plaintiff was advised of the hospital's conclusion following its investigation, she objected to it, still believing that Fromm had stolen a patient's drugs and felt the investigation had been whitewashed because she was never asked to participate in it.

The result of the investigation was conveyed to plaintiff by Voorman–Fish in a letter dated February 14, 1992. Shortly thereafter, someone posted the letter in the coffee room. Both Voorman–Fish and Del Moro denied doing that. The letter was addressed only to plaintiff and not copied to anyone else. It stated:

> We have looked into your allegations concerning Peter Fromm, MICP, and to-date, can find nothing to substantiate an improper act of the nature you note on his part. Given the lack of corroboration and with due respect for the level of professional conduct Mr. Fromm has exhibited while in our employ, I find no reason to pursue this matter any further.
>
> If you are able to present corroborative evidence of any nature bearing on this matter, please contact me.

## C.

### Alleged retaliatory defendants

Shortly after the January 15 incident, Del Moro received letters from six MICNs and MICPs which advised him that they no longer felt that they could trust plaintiff and that they no longer wanted to be scheduled to work with her. They expressed

concern that plaintiff could make false accusations against them. Del Moro also received another letter from Fromm which stated that in light of the accusations made against him, Fromm could no longer work with plaintiff.

As a result of the letters that were received, Voorman–Fish called a meeting for January 27, 1992. Plaintiff was asked to attend. In addition to Voorman–Fish and Del Moro, defendants Daniel DeSantis, the Director of Personnel, Myron Horowitz, the Director of Labor Relations, and Louis Ycre, the president of the hospital, also attended, as well as a union representative. According to Voorman–Fish, the purpose of the meeting "was to apprise the union representative of what had ensued, what the allegations were, the result of the investigation, the receipt of these letters, and our need to move on." Plaintiff was shown letters from her co-employees stating that they refused to work with her out of fear that she would turn them in.

Each letter expressed the sentiments reflected in the following letter from Cathy Roy, an MICU paramedic:

> In view of the recent incident involving accusations made by Josephine Higgins against a fellow staff member, I would like to make known my wishes that I not be scheduled to work on the MICU with Ms. Higgins in the future.
>
> I value my certification, my reputation and the fine reputation of the MICU at Pascack Valley Hospital too much to see any one of them jeopardized by any possible detrimental action taken by the aforementioned individual.

All but one of the letters were typed on Del Moro's office computer; each writer claimed that his or her letter was unsolicited, although most knew that others also were going to write a letter.

Among the things that bothered the co-employees about plaintiff's accusation of Fromm was her failure to speak with Fromm before reporting him; this was a breach of the nursing code of ethics, which requires one to consult one's partner before alleging misconduct against him or her. Cathy Roy described plaintiff "as having a very over reactive hyperactive personality with sort of a crusader complex," meaning that she felt she could "single-handedly save the world."

Del Moro told plaintiff that the president of the hospital "was concerned that they could not keep the mobile intensive care unit on the road so that they were going to remove me from the mobile intensive care unit and place me into the emergency room." Plaintiff was told to turn in her keys to the MICU vehicle and her portable radio.

In a letter of January 30, 1992, Voorman–Fish advised plaintiff as follows:

As I stated to you at our meeting Tuesday morning, I have received individual written requests from almost all the MICU personnel that you not be assigned to ride with them. Accordingly, I must require that you perform your duties as an unscheduled per diem nurse in the Emergency Room until further notice. I will maintain this position until a sufficient number of MICU personnel express a willingness to be assigned as your MICU partner for scheduling purposes.

Although working in the Emergency Room is currently a part of the expectations of your position as an MICN, the Hospital will provide you with additional orientation and you will have the opportunity to work, on the average, the same number of hours as you had been assigned on the MICU so that your earning ability remains unaffected.

This decision is an administrative act on my part to insure a smoothly functioning MICU and is not to be construed as discipline or a reprimand of any sort. My single interest and responsibility is that quality patient care continues to be delivered to those who require it.

After removal from the MICU, plaintiff felt that Del Moro wanted "to get even for what I had done to . . . another paramedic." She said one way this manifested itself was in her being scheduled for fewer hours. After working her new emergency room assignment for just one day, plaintiff was advised by her union representative, Heck, not to return to the emergency room, as she had been hired for the MICU and not the emergency room. In the second week of February 1992, plaintiff was allowed to return to the MICU but as a third member; normally, a third member was a trainee or observer. Del Moro met with the MICU staff and affirmed that everyone had to work as scheduled, in order to maintain the efficiency of the unit.

Eventually, sometime later in 1992, plaintiff was permitted to participate as one of the two principal riders. But, according to plaintiff, she "was working far less" than before. Del Moro, who

was in charge of scheduling, denied any conscious attempt to reduce plaintiff's hours. But because he felt that plaintiff herself had made herself available with unacceptable frequency, by August 1993 Del Moro had decided that plaintiff should be fired, and he recommended that to Diane Bongiovanni, Director of Nursing for Special Units. But Bongiovanni declined.

On January 30, 1992, plaintiff applied for a posted full-time position as an MICU night nurse. At the same time a day-time position was posted; plaintiff applied for them both. In April 1992 plaintiff was interviewed for the night job by Bongiovanni. Bongiovanni selected the other applicant, Bruce Contini, a paramedic who had just finished nursing school. At trial she explained her reasons for picking Contini:

> Because I felt at that point he had a significant amount of more hours in advanced life support and more recent emergency room experience that related to advance life support and had more experience with the types of skills and requirements that were needed in advanced life support.

She denied that there were any other factors influencing her decision. When confronted with her deposition, however, she admitted that Contini had told her that he would resign if he were not selected, and that she factored that into her decision. Plaintiff was upset because she had far more experience than Contini. Mary McIntyre, an unscheduled per diem nurse, also opined that Contini's "qualifications were nowhere near equal to Josephine's." Moreover, under the collective bargaining agreement members of the union were entitled to preference for job openings, yet Contini was not a member at the time he applied; he had become a member by the time of his hiring in April 1992. According to McIntyre, in March 1992, before Contini became a union member, Horowitz told her that Contini would "probably get the job." By letter of April 10, 1992, the personnel office notified plaintiff that the hospital had decided not to fill the other, day-time position and had therefore eliminated it.

Marcy Carovillano, an unscheduled per diem paramedic in the MICU, began working in October 1993. She was surprised that Del Moro would say "very derogatory, inflammatory things" about

plaintiff in front of her and other employees. Del Moro told Carovillano "to watch out for [plaintiff], she's bad news, . . . watch your back, she'll, you know, on calls and she can write people up on the drop of a dime and he was laying the ground work to me, of trying to dishonor someone." She heard similar warnings from others, "almost like everybody was programmed to say exactly the same thing." Several of the staff told Carovillano that plaintiff was to be scheduled only "if they were really desperate." But after plaintiff filed the instant action, Del Moro said that plaintiff would have to be given more hours; otherwise, "it wouldn't look good." When Carovillano finally met and worked with plaintiff, she found plaintiff to be an excellent worker and a "pleasure" to work with.

In June 1994 Fromm became clinical supervisor and began assisting with the scheduling of MICU personnel. He denied ever passing over plaintiff in retaliation for her accusations against him. He estimated that about forty percent of the time plaintiff failed to return his calls for her to work.

## II

In the first four points of their main brief, defendants argue for reversal of the CEPA portion of the verdict. In Point I, as well as in part of Point II and Point IV, they contend that, as a matter of law, CEPA was never intended to protect those who protest the illegal conduct of co-employees, as opposed to the illegal conduct of the employer itself.

Defendants raised this contention as part of their motion to dismiss at the close of plaintiff's case. At that time, the trial judge denied the motion, holding that it was for the jury to determine whether CEPA protected plaintiff in these circumstances, an issue that she said was "very close." She did not expressly discuss defendants' claim that the act did not apply to misconduct of co-employees.

Defendants reasserted the point in support of their motion for judgment notwithstanding the verdict. In support of their n.o.v.

motion, defendants relied on an unreported Appellate Division opinion, *Jensen v. Harrah's Casino Hotel,* No. A–4129–93 (App. Div. May 4, 1995), *certif. denied,* 142 *N.J.* 455, 663 *A.*2d 1361 (1995). In that case plaintiff, a marketing operations supervisor for a casino, was fired after she told the manager of another department (not her immediate supervisor) that she suspected another marketing operations supervisor of stealing casino coupons. In her CEPA action plaintiff alleged that defendant joined in a "cover up" of the employee's misconduct and was careless in enforcing existing procedures. The trial court granted summary judgment to defendant, noting that *N.J.S.A.* 34:19–3 applied to illegal activity by an employer, not by another employee. We affirmed, relying upon *Abbamont v. Piscatway Township Bd. of Educ.,* 138 *N.J.* 405, 650 *A.*2d 958 (1994). We thought in *Jensen* that a plaintiff seeking protection under *N.J.S.A.* 34:19–3 must demonstrate employer involvement in workplace violation of a law, rule, or a clear mandate of public policy.

In ruling on defendants' motion and denying it, the trial judge here agreed that employer involvement in the alleged violative conduct was required. She said "I believe the entire statute requires the employer's complicity, or you don't have a case...." She thought, however, that there was ample evidence to show such complicity and so denied the motion. She observed:

I believe that the entire statute requires the employer's complicity, or you don't have a case, *but I do believe there was ample evidence on this record to show the employer's complicity. That if it was an initial complaint against a co-employee, it does not negate the fact of an employer's responsibility under CEPA where the employer does nothing, and in fact does—does nothing to rectify the obvious, illegal activity that is being complained about.* ... *[T]he result of the inadequate education and investigation of the complaint is the termination with zero cause—* which was what this record was—zero cause for termination of Ms. Higgins [sic] services, *and a[n] inflammation of the emotions in the work place setting by the supervisors—directly by the supervisors to instill fear and hatred against Ms. Higgins* to make it impossible for her to continue as an MICN in this unit.

I had ten or more people come here and tell a jury that for reasons that they could not articulate they didn't want to work with Ms. Higgins. Was it because she wasn't able to do her job? No. Was it because she wasn't qualified to do her job? No. Had they ever had any problems with Ms. Higgins? No. Was she always there when she was called to a job? Yes, but we didn't want to work with her, so there

was only one reason articulated on this trial record as to why they didn't want to work with her. It was because the entire administration at Pascack Valley did zero to mitigate that ramp in emotion that had no foundation, in fact, and were derived upon [sic] an illegal activity of one employee as seen by Ms. Higgins.

Now, does that mean that the person that was alleged to have stolen drugs had to be terminated? No, *but it certainly doesn't mean that his activities can be condoned and rewarded, and everyone who supports him can be rewarded while Ms. Higgins takes the brunt of an administration who did not want to—to find out what really happened.*

[Emphasis added.]

The judge, then, clearly thought that the hospital had, in effect, whitewashed the investigation, thus tying itself to the employee's misdeeds.

CEPA provides in pertinent part as follows:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice *of the employer* or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, . . .;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law *by the employer* or another employer, with whom there is a business relationship, . . .; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .;

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare. . . .

[*N.J.S.A.* 34:19–3 (emphasis added).]

"Employer" is defined in CEPA to mean "any individual, partner-ship, association, corporation or any person or group of persons *acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent . . . .*" *N.J.S.A.* 34:19–2a (emphasis added).

The Supreme Court in *Abbamont v. Piscataway Township Bd. of Educ.*, 138 *N.J.* 405, 650 *A.*2d 958 (1994), discussed the purposes of CEPA as follows:

In 1986 the Legislature enacted CEPA to protect employees from retaliatory actions by employers. That law protects "whistle-blowers," "who, believing that the public interest overrides the interest of the organization he [or she] serves, publicly 'blows the whistle' *if the organization is involved in corrupt, illegal, fraudulent, or harmful activity."* As the bill's sponsor stated, CEPA's enactment is "important to all New Jersey workers who are concerned about working in a safe environment *with honest employers."* When signing the whistleblower law, Governor Kean explained CEPA's purpose:

> It is most unfortunate—but, nonetheless, true—that conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity *on the part of his or her employer.*
>
> It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.

[*Id.* at 417–18, 650 *A.*2d 958 (citations omitted) (emphasis added).]

The focus of CEPA's perceived purpose, then, is upon protecting employees who reasonably believe something is very amiss with their employer's activities and who want to prompt corrective action, or simply lodge a complaint. Thus, *N.J.S.A.* 34:19–3 a and b expressly ·refer to whistleblowing on an activity, policy or practice "of" or "by" "the employer." Plaintiff contends, using standard principles of statutory construction, that the absence of such modifying phrase in *N.J.S.A.* 34:19–3c reflects a legislative intent to broaden the scope of CEPA's protective umbrella to any workplace activity, whether or not acquiesced in by the employer. Plaintiff construes CEPA to impose strict liability upon an employer and its supervisors for the misconduct, or reasonably believed misconduct, of a nonsupervisory employee.

We recognize that subsection c may be so broadly read. But we are convinced that the Supreme Court's discussion of employer liability under CEPA for compensatory and punitive damages in *Abbamont* and its understanding of the difference between strict liability and vicarious liability in the context of a CEPA cause of action, is dispositive. We therefore need not engage in extended discourse and analysis of CEPA and its scope, or survey the scope of similar whistleblower statutes in other states, a task neither party has attempted to do.

After discerning CEPA's focus upon " 'New Jersey workers who are concerned about working in a safe environment with honest employers,' " 138 *N.J.* at 417, 650 *A.2d* 958, the court in *Abbamont* held that the "traditional doctrine of respondeat superior governs employer liability for compensatory damages under CEPA[,]" *id.* at 418, 650 *A.2d* 958, and that " 'the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference[,]' " *id.* at 419, 650 *A.2d* 958 (quoting *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 625, 626 *A.2d* 445 (1993)). Critical to its analysis in explaining the concept of respondeat superior in the context of compensatory damages, the Supreme Court resorted to agency law which it considered as " 'sufficiently flexible to provide just results in the great variety of circumstances presented by [the retaliatory discharge of whistle-blowers] and to accomplish the purposes of [CEPA].' " *Id.* at 418, 650 *A.2d* 958 (quoting *Lehmann, supra,* 132 *N.J.* at 619, 626 *A.2d* 445). In rejecting the argument that agency principles should not pertain because CEPA requires intentional employer conduct, the court observed: " '[a]ccording to the trend of modern authority, the liability of an employer for the acts of his employee depends not upon whether the injurious act of the employee was wilful and intentional or was unintentional, but *upon whether the employee, when he did the wrong, was acting in the prosecution of the employer's business and within the scope of his authority, or had stepped aside from that business and done an individual wrong.' " Abbamont, supra,* 138 *N.J.* at 419, 650 *A.2d* 958 (quoting 53 *Am.Jur.2d* Master & Servant § 438 (1970) (emphasis added)).[2] Here, plaintiff accused Fromm and Contini of falsifying

---

[2] In the context of employer LAD responsibility for workplace sexual harassment, the court explained more fully the concept of vicariously employer liability in *Lehmann v. Toys 'R' Us, Inc., supra,* 132 *N.J.* at 624, 626 *A.2d* 445:

An employer will be found vicariously liable if the supervisor acted within the scope of his or her employment. Moreover, even if the supervisor acted outside the scope of his or her employment, the employer will be vicariously liable if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was

records and accused Fromm of stealing drugs. Such misconduct, at the time of its commission, certainly could not be considered to have been within the scope of the employee's authority or as in the fulfillment of the employer's business.

■ Our reading of the statute and its legislative history with our understanding of the sense of *Abbamont* leads us to the conclusion that in order for plaintiff to be entitled to compensatory damages on her CEPA claim, she must demonstrate that Voorman–Fish and Del Moro either condoned or ratified the alleged violative conduct of which she complained and for which she says she was retaliated against. *Cf. Maher v. New Jersey Transit Rail Operations, Inc.*, 239 *N.J.Super.* 213, 570 *A.2d* 1289 (App.Div. 1990), *aff'd in part, rev'd in part* 125 *N.J.* 455, 593 *A.2d* 750 (1991) (plaintiff claimed he was harassed and fired because he reported a co-employee for misconduct, including drinking alcohol on the job. We reversed the summary judgment granted based on a federal preemption, but noted the "dubious" nature of plaintiff's claim under CEPA. *Id.* at 228, 570 *A.2d* 1289.). *Contrast Barratt v. Cushman & Wakefield of N.J., Inc.*, 144 *N.J.* 120, 675 *A.2d* 1094 (1996).

In our view, then, plaintiff's CEPA cause of action depends upon her contention that not only had Fromm violated hospital procedure, not to mention various applicable administrative code provisions, and, as to the medication theft incident, criminal laws, but

aided in the commission of the harassment by the agency relationship. Thus, an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment if the employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment. An employer may also be held vicariously liable for compensatory damages for supervisory sexual harassment that occurs outside the scope of the supervisor's authority, if the employer had actual or constructive notice of the harassment, or even if the employer did not have actual or constructive notice, if the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims.

*See generally, Restatement (Second) of Agency,* § 219.

the hospital, through its supervisors Del Moro and Voorman–Fish, condoned and ratified that conduct by whitewashing the investigation. Were that so, we have no doubt that damages against the hospital would be warranted.[3]

■ Our concern, however, is that the jury charge was not so focused. In this respect, we note the first two interrogatories submitted to the jury. The first required the jury to consider the alleged misconduct of Fromm; the second that of the hospital, that is to say Voorman–Fish and Del Moro. As to the hospital, the trial judge instructed the jury in pertinent part:

> In this case, plaintiff, Josephine Higgins, has alleged that she was retaliated against because she objected to or refused to participate in an activity, policy, or practice which plaintiff, Josephine Higgins, reasonably believed was a past, present, or potential continuing violation of the law, rule, or a regulation promulgated pursuant to law; or, fraudulent or criminal; or, incompatible with a clear mandate of public policy concerning the public health, safety, or welfare of a—of the public. To prevail on this claim, the plaintiff, Josephine Higgins, has the burden of showing by a preponderance of evidence that *she reasonably believed that an activity, policy, or practice of the defendant in violation of the law, and in that case, she*

---

[3] In this respect we agree with plaintiff that thefts of medication and falsification of records constitute a violation of a law or a clear mandate of public policy, not to mention a violation of pertinent administrative regulation and criminal laws. As she asserts in her brief:

> The theft of a patient's medication, or the falsification of paperwork regarding patient care, plainly are illegal activities that directly impact the public interest in the provision of health care. *See also, e.g., N.J.S.A.* 2C:21–4.1 (making it a crime to "falsif[y] any record relating to the care of a medical ... patient"); *N.J.S.A.* 2C:20–1 *et seq.* (theft and related offenses); *N.J.S.A.* 2C:35–1 *et seq.* (unlawful possession of drugs).

Moreover, defendants concede in their brief:

> The defendants will acknowledge that the activities Higgins' [sic] accused Fromm and Contini of having engaged would have constituted violations of law, regulations and public policy if those activities occurred. The Hospital investigated each of the accusations made by Higgins, however, and determined that the activities which formed the bases of her accusations had not occurred.

*And see, e.g., Barratt v. Cushman & Wakefield of N.J., Inc., supra,* 144 N.J. at 131, 675 A.2d 1094 ("[s]tatutes and administrative regulations ... are precisely the mandates of public policy that will support an action for wrongful discharge."); *Chelly v. Knoll Pharmaceuticals,* 295 *N.J.Super.* 478, 488, 685 A.2d 498 (App.Div.1996).

*alleged that she observed a co-worker taking medications from a patient, prescribed medications in their—in the house. A rule a regulation promulgated pursuant to this law, that had to do with the documentation on another incident, namely, the blue or white sheets that you heard about.*

And these allegations also fall with—in the purview of incompatibility with a clear mandate of public policy concerning the public health, safety, or welfare, in that, plaintiff has alleged and has to prove that allegation that control of and documentation relating to the patient's prescription medication in her home was not followed. She—she objected to or refused to participate in that activity or practice. (3) That retaliatory action was taken against her by way of an adverse employment action. And, (4) that there was a causal link between the plaintiff, Josephine Higgins, reporting and the retaliatory or adverse action of the defendant. She has to prove all four of those elements.

*To establish the first element of her claim,* it is the plaintiff, Josephine Higgins' burden to prove by a preponderance of the evidence, that in light of the circumstances facing her and the knowledge possessed by her at the time, she formed her belief. *She has a reasonable belief that the activity, policy, or practice of the defendant through the employees was in violation of the law, rule or regulation; was fraudulent or criminal; was incompatible with a clear mandate of public policy concerning the public health, safety, or welfare of patients.*

. . . . . . . .

Plaintiff cannot prove her claim of retaliation merely by conclusory statements or by speculating that the action taken against her *was in response to her objections to or refusal to participate in the activity, policy, or practice of the employer as— as condoned by the defendant, Pascack Valley Hospital, because obviously, the hospital can only act through its employees and its administration. So, that's why I say it has to be shown that it was acts condoned by the defendant, Pascack Valley.*

*Defendant cannot be charged with a retaliatory motive if you find that defendant hospital's conduct towards the plaintiff did not change perceptively following her objections that she had made to her supervisor at various times. In this case, the defendant is free to show that the retaliatory action taken against the plaintiff was animated, that is, caused by her incompetence, her disloyalty, reduction in forces of the hospital or any other legitimate reason.* Plaintiff must then place on the record after the hospital may have endeavored to show those elements, then plaintiff would have to place on the record tangible evidence to show that the defendant Pascack Valley's failure to follow the contract and give the job—gave the job to Contini instead of her, because of her alleged failure to respond to calls, or make herself available, or any other of defendant's proofs, were all what we call a pretext, an endeavor to justify that their otherwise retaliatory actions.

[Emphasis added.]

Finally, when explaining interrogatory # 2 relating to the hospital's violation of a clear mandate of public policy, law or regulation,

the judge said no more than "[n]umber 2 ... asks you ... what was [the hospital's] response."

These instructions are erroneous for two reasons. First, they seem to tell the jury that the violation by her co-employee, in and of itself, is enough. We say this because the judge told the jury that to establish the first element of her burden of proof, plaintiff need demonstrate a reasonable belief of a violation by "defendant through the employees." But just prior to this statement, the judge had referred to Fromm's alleged misconduct. And, although the word "condoned" was used, no distinction was made between the co-employees' conduct and the handling of plaintiff's complaints by Del Moro and Voorman–Fish.

Second, the jury charge did not focus the jury's attention upon what action on the part of Voorman–Fish and Del Moro would implicate the hospital for the purposes of imposing responsibility for CEPA damages. As we have said, CEPA is premised upon remediation of alleged employer violative conduct, here, that relating to the document falsification and medicine theft. To establish the necessary employer conduct, plaintiff contended that the hospital's investigations were a sham and a cover-up. Were that so, *Abbamont*'s agency principles would have been satisfied, for a sham or bad faith investigation would reflect a condoning or ratification of the misdeeds. The problem is, the jury was not told that that is what it must conclude to affirmatively answer interrogatory # 2 as to the employer's violation of a clear mandate of public policy, law or regulation. Under the jury charge, the jury could have believed simply that the hospital's investigation, though conducted in good faith, was nonetheless inadequate and that the hospital should have done a better investigation which would have vindicated plaintiff's complaints.

We do not believe that where the employer investigates a complaint as to a co-employee's conduct that is alleged to fall within *N.J.S.A.* 34:19–3(c)(1), (2) or (3) and does so in good faith, but nonetheless, perhaps because of some inadequacies in the investigative techniques or, perhaps, because some source of infor-

mation was misleading, reaches a conclusion a jury may think is incorrect, such an incorrect result may *ipso facto* constitute a violation of a clear mandate of public policy or law. As we have said, the gravamen of plaintiff's claims was her complaint of drug theft and false or improper paperwork and the retaliation thereon. It is the employer's complicity in that activity that must be the basis for damages under CEPA. That is to say, the jury should have been told that it must determine not just whether the investigation of the complaint led to what it perceived was the right result, but whether the investigation was conducted in bad faith and was a sham or cover-up of the misconduct such that master/servant or principal/agent liability evolved between the hospital and its supervisors, Voorman–Fish and Del Moro.

The trial judge did not make this clear and we can not tell from the jury verdict whether it answered #2 yes because it found the investigation was a cover-up or because it simply felt the investigation reached the wrong result. If the jury premised its findings on the former, a CEPA violation would be well-founded. But if it concluded defendant's "retaliation" was attributed to a good faith but erroneous investigation, we are convinced CEPA would not apply.

### III

■ Plaintiff's complaint alleged defamation based upon the posting of the February 14, 1992 letter from Voorman–Fish to plaintiff concerning the January 15, 1992 pill-theft incident. We have previously set forth the contents of that letter. In general, Voorman–Fish told plaintiff that the hospital could "find nothing to substantiate an improper act of the nature" she had complained of and that because of that and because of Fromm's prior "level of professional conduct," she saw no basis for further pursuing the matter. However, she urged plaintiff to contact her if she could present any other evidence that would substantiate her accusation.

Defendants' motion for summary judgment on the grounds that the letter did not have a defamatory meaning as a matter of law was unsuccessful. The motion judge said:

> [T]he letter is reasonably susceptible of a defamatory meaning. The letter which was addressed to the plaintiff and posted on a Hospital bulletin board made it clear that Ms. Voorman–Fish found her allegations against Peter Fromm to be uncorroborated. Further the court agrees with plaintiff that a reasonable person could conclude that the reference to Mr. Fromm's professionalism implicitly questions that of Ms. Higgins.

Defendants reasserted their argument in their motion for judgment at the end of plaintiff's case. The trial judge found that the jury could find that the letter defamed plaintiff and that the hospital was liable for allowing the letter to be posted. However, during summations, it became clear that in addition to the February 14 letter, counsel intended to argue that the letters of the co-employees expressing their desire not to be scheduled with plaintiff were also defamatory. When defense counsel raised an objection, the trial judge ruled, in apparent contradiction of her ruling in denying defendants' motion for judgment, that the Voorman–Fish letter itself was "a statement of fact about the ... result of an investigation and therefore couldn't possibly be defamatory." Thus, reasoned the judge, if that were the only basis of plaintiff's defamation action, she would "have to throw it out." But she concluded the letter was defamatory:

> if placed in conjunction with the actions and inactions of the hospital concerning what they knew was being said about her and that they were complicit in denying her; namely, never addressing with the people the fact that there is not a scintilla of evidence to say that she is not trustworthy, that in fact, she had done her job in accordance with the policies, procedures and—of the hospital, as well as the State of New Jersey. That's the essence of the defamation. It is plain on its face....

She added that "it was the countenancing of behavior within the department that directly defamed" plaintiff, and that "[i]t was the cumulative effect of the coworkers, the hospital administration that directly impugned her business professional reputation...." The judge considered defendants' failure to respond to the co-employees' letters as indicating that plaintiff indeed was trustworthy. And the trial judge referred to the co-employees' letters as

being defamatory per se. In her charge to the jury, the judge identified the allegedly defamatory statements as such:

> that she [plaintiff] couldn't be trusted; that people couldn't work with her because they weren't able to have confidence in her working together with them. And, that, coupled with the letter that was posted that was addressed to Ms. Higgins only, and the statements in that letter combined to defame her.

As far as we can discern, the trial judge's view seemed to be that: 1) the co-employees' letters expressed the writers' belief that plaintiff was not trustworthy and had acted irresponsibly in reporting the two incidents; 2) the evidence showed that plaintiff, in fact, had acted properly in reporting the incidents and had never been guilty of untrustworthy conduct on the job; 3) defendants were aware that the co-employees' beliefs were unfounded; 4) in spite of this awareness, defendants never attempted to correct the co-employees' misapprehensions about plaintiff, thereby in effect, reinforcing and condoning those misapprehensions; 5) the posting of the Voorman–Fish letter, while not defamatory in itself, evidences defendants' "countenancing" of the co-employees' attitudes; 6) that "countenancing" constituted the defamation.

 However the judge's formulation of the cause of action might be characterized, we do not think the critical letter comes close to being classifiable as defamation.

> A defamatory statement is one that is false and "injurious to the reputation of another" or exposes another person to "hatred, contempt or ridicule" or subjects another person to "a loss of the good will and confidence" in which he or she is held by others.
>
> [*Romaine v. Kallinger*, 109 *N.J.* 282, 289, 537 *A.*2d 284 (1988), quoting *Leers v. Green*, 24 *N.J.* 239, 251, 131 *A.*2d 781 (1957).]

*See Casamasino v. City of Jersey City*, 304 *N.J.Super.* 226, 243, 699 *A.*2d 697 (App.Div.1997). If the offending statement is not capable of a defamatory meaning, the trial court should dismiss the claim as a matter of law. *Romaine v. Kallinger, supra*, 109 *N.J.* at 290, 537 *A.*2d 284. In so determining, it is the "fair and natural" meaning that a reasonable person of ordinary intelligence and sensibility would give the statement that must be considered. *Ward v. Zelikovsky*, 136 *N.J.* 516, 529, 643 *A.*2d 972 (1994); *Romaine v. Kallinger, supra*, 109 *N.J.* at 290, 537 *A.*2d 284. As

observed by the Supreme Court in *Ward v. Zelikovsky, supra,* 136 *N.J.* at 529, 643 *A.*2d 972 "[t]he First Amendment 'does not embrace the trite wallflower politeness of the cliche that if you can't say anything good about a person you should say nothing at all.'" (quoting Rodney A. Smolla, *Law of Defamation,* § 6.09[2], at 6–37 (1986)). *Cf. Romaine v. Kallinger, supra,* 109 *N.J.* at 295, 537 *A.*2d 284 (in the conceptually related law of privacy, there can be no recovery for false-light invasion of privacy unless the publication is of a character "'highly offensive to a reasonable person.' ... [t]his protection of privacy does not extend to the 'hypersensitive person[.]'" (citations omitted)).

■ Voorman–Fish's letter contained no language expressly or impliedly exposing plaintiff to ridicule or otherwise attacking her reputation. Contrary to plaintiff's reading of it, it could not, even in the context of all the circumstances, reasonably be "understood to mean that plaintiff, at best, had made wild accusations; at worst, she had lied." The letter simply says that her complaints were investigated and "to date" Voorman–Fish could find no substantiation and thus no reason to continue the investigation, but requested plaintiff to provide more information if she had any. We hardly see how this defames plaintiff. Moreover, the February 14 letter was not false; it accurately reported the results of defendants' investigation. True statements are absolutely protected under the First Amendment. *Ward v. Zelikovsky, supra,* 136 *N.J.* at 530, 643 *A.*2d 972.

■ Indeed, the trial judge ultimately did *not* find that the letter was defamatory. She expressly ruled that the letter contained "a statement of fact about the ... result of an investigation and therefore couldn't possibly be defamatory." The only way the letter was pertinent to the defamation, reasoned the judge, was that it was some evidence that defendants failed to correct the co-employees' opinions that plaintiff had acted unprofessionally in reporting the incidents. But this is not defamation.

■ In their own letters, the co-employees expressed their opinions that plaintiff's accusations against Fromm and Contini

were unfounded and they declared their unwillingness to work with plaintiff. These letters were expressions of opinion concerning plaintiff's good faith and made no statements of fact about her. Only a statement of fact can be defamatory; mere expressions of opinion, which, by their nature, can never be proved true or false, are not actionable, unless they imply the existence of undisclosed facts. *Ward v. Zelikovsky, supra,* 136 *N.J.* at 531, 643 *A.*2d 972; *Karnell v. Campbell,* 206 *N.J.Super.* 81, 89, 501 *A.*2d 1029 (App. Div.1985). If the letters are not defamatory neither can be the hospital's failure, as thought by the trial judge, to refute the contents of the co-employees letters.

## IV

We thus reverse the judgment as to defamation and dismiss that count of the complaint. We reverse the judgment for damages, counsel fees and costs based upon CEPA and remand for a new trial consistent with this opinion. We do not retain jurisdiction.