[626 NYS2d 137]

JAMES J. RODGERS, Respondent, v LENOX HILL HOSPITAL, Appellant.

First Department, May 9, 1995

## APPEARANCES OF COUNSEL

*Wayne N. Outten* of counsel, New York City *(Anne Golden* on the brief; *Lankenau Kovner & Kurtz,* attorneys), for respondent.

*Nathaniel H. Akerman* and *Bernard A. Solnik* of counsel, New York City *(Seyfarth, Shaw, Fairweather & Geraldson,* attorneys), for appellant.

## OPINION OF THE COURT

ROSENBERGER, J.

On the afternoon of February 4, 1992, 79-year-old Joan Reckleff was discovered lying unconscious on the floor of her apartment at 200 East 66th Street. The New York City Police Department requested Emergency Medical Service (EMS) assistance for her. A unit from Lenox Hill Hospital, consisting of paramedics Manfred Fuchs and Peter Halleck, arrived shortly thereafter, and pronounced Reckleff dead, apparently without having ever examined her body. Halleck allegedly watched from the doorway, not entering the room in which the patient was. The paramedics left the patient without examining her, administering aid, or attempting resuscitation.

Approximately 15 minutes later, police officers on the scene saw Reckleff move. They again called their dispatcher for paramedics. Fuchs and Halleck were redispatched to the apartment at 6:33 P.M., approximately 37 minutes after the original call. Paramedics John Guerriero and Leonard Sadowsky also arrived at the scene to assist. Apparently Fuchs, Halleck, and Guerriero entered Reckleff's apartment, while Sadowsky remained in his ambulance finishing his dinner.

Although the patient's 66th Street apartment was closer to New York Hospital at 1st Avenue and 70th Street, the paramedics transported the patient, who was now characterized by them as nonresponsive but alive, to the more distant Lenox Hill. No resuscitative measures were provided to the patient

en route, until the ambulance arrived in front of the hospital. At that point an endotracheal tube was placed "blindly" into the patient, without the use of a laryngoscope blade and handle. Reckleff was examined by hospital personnel and pronounced dead at 7:19 P.M.

The paramedics involved in this incident attempted to cover up their mistakes by destroying and redrafting the original log sheet which showed their first dispatch to the apartment,[1] and by attempting to conceal the fact that there had been two separate ambulance calls to the location. The paramedics also allegedly falsely told the plaintiff, who was the director of the EMS Department at Lenox Hill Hospital at the time of this incident, that Reckleff had been dead the whole time, and that they were just "going through the motions" in bringing her to the hospital. Plaintiff began his own investigation of the incident.

The incident ultimately became the subject of adverse publicity and an investigation by the New York State Department of Health and the New York City EMS. On February 5, 1992, plaintiff was allegedly commanded to appear at a meeting with Lenox Hill officials who told him to turn over all relevant reports and log sheets, and to refrain from further participation in the investigation. However, plaintiff apparently continued to investigate the incident, and upon concluding that the paramedics had violated various laws, operating procedures, and protocols,[2] he recommended to Lenox Hill's Chief of Emergency Services that the paramedics be disciplined and retrained.

In March of 1992, before plaintiff's interview by the investigators from the State Department of Health, he was briefed on his expected testimony by Lenox Hill officials, who insisted that it was preferable that State authorities believe that the hospital was deficient in administrative function rather than in its provision of clinical care. After the plaintiff responded honestly to all questions put to him by the investigators, he was terminated, without notice, from his job on April 6, 1992.

---

1. The original log sheet was subsequently found in the garbage of the ambulance crew's quarters, and the torn pieces were reconstructed.

2. The following are among the sections alleged to have been violated: EMS Operating Guide, Procedures Nos. 106-2 and 106-9 and State Regional Protocols [initiating resuscitative measures and presumptive diagnosis of death]; EMS Operating Guide, Procedures Nos. 91-02 and 106-2 [gaining access to a patient; on scene operations]; EMS Operating Guide, Procedure No. 115-1 [emergency department ambulance diversions].

Plaintiff then brought the instant suit pursuant to Labor Law § 740, New York's "whistleblower statute", claiming that he was fired in retaliation for his investigation into the manner in which the emergency ambulance call had been handled, and his testimony before the New York State Department of Health with regard to the incident. Lenox Hill moved to dismiss the complaint for failure to state a claim, and to recover its attorneys' fees and other litigation costs. The Supreme Court denied defendant's motion in its entirety. This appeal ensued.

Viewing the complaint in the light most favorable to the plaintiff *(Guggenheimer v Ginzburg,* 43 NY2d 268), and presuming the factual allegations supporting plaintiff's claim to be true *(Leibowitz v Bank Leumi Trust Co.,* 152 AD2d 169), we find that plaintiff's claim falls within both the letter and the spirit of the whistleblower statute.

Labor Law § 740 prohibits an employer from taking retaliatory action against an employee who, in relevant part, either "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety" (Labor Law § 740 [2] [a]), or "objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule, or regulation" (Labor Law § 740 [2] [c]). The statute's goal is to encourage employees, like this plaintiff, to report hazards to supervisors and, if necessary, to public authorities, with the intended effect of offsetting the "frequent tendency of layers within organizations to screen out information which might cause embarrassment if it reached the top of the organization or the outside" (Givens, Practice Commentaries, McKinney's Cons Laws of NY, Book 30, Labor Law § 740, at 546).

Plaintiff's complaint, which pleads with particularity facts sufficient to support the claim that he was fired in retaliation for his investigation and testimony with respect to the Reckleff incident, falls within the ambit of section 740.

The defendant argues that this complaint is deficient because Rodgers lacked personal knowledge of the improprieties upon which it is based. However, the firsthand knowledge requirement advanced by the defendant is neither required by the relevant portion of the whistleblower statute, nor by the case law interpreting this section. Plaintiff's information re-

garding the paramedics' gross derelictions was obtained from the paramedics' own admissions against interest, from his personal observations of altered documents, and from his own conversations and interaction with Lenox Hill personnel. It was sufficient to state a cause of action.

Contrary to the defendant's understanding, a comparison of Labor Law § 740 and Civil Service Law § 75-b, the analogous, more permissive section applicable to public employees,[3] does not compel a requirement of eyewitness knowledge of all violations when a complaint in the private sector is contemplated. Although the Third Department recently declined to extend the protection afforded by Labor Law § 740 to employees harboring a mere "reasonable belief" that an activity is in violation of a law, rule or regulation (Bordell v General Elec. Co., 208 AD2d 219), the facts of Bordell are distinguishable because the plaintiff in that case alleged that he was fired for expressing an uncorroborated preliminary opinion that a number of employees had been exposed to dangerous radiation. At the time Mr. Bordell brought his complaint, his opinion was unsubstantiated, and he could cite no law, rule or regulation that had been violated by the company. Based upon this defect, and analyzing the distinction between the statutory language of Labor Law § 740 and Civil Service Law § 75-b,[4] the Third Department affirmed a dismissal of the complaint.

Here, by contrast, plaintiff alleged uncontested facts supporting numerous actual violations, in that the paramedics pronounced a live woman dead without examining her or attempting resuscitation, that they attempted to cover up a second call to the same location, that they did not transport the critically ill patient to the closest hospital, and that they engaged in improper resuscitation. All of this was to show

---

**3.** Civil Service Law § 75-b (2) (a) states as follows: "A public employer shall not dismiss * * * a public employee * * * because the employee discloses to a governmental body information: (i) regarding a violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) *which the employee reasonably believes to be true and reasonably believes constitutes and improper governmental action*" (emphasis added).

**4.** In 1984, Labor Law § 740 and Civil Service Law § 75-b were enacted together as comparison provisions containing parallel language. Subsequently, in 1986, Civil Service Law § 75-b was amended to expand protection to public employees basing their claims upon a "reasonable belief" of a violation (*see,* Civil Service Law § 75-b [2] [a], as amended). No comparative amendment was made to Labor Law § 740.

that numerous laws, operating procedures, and protocols had actually been violated. He cited with particularity the relevant sections of the Administrative Code, the Public Health Law, the EMS Operating Guide, and the Department of Health Treatment Protocols which were violated by the specific conduct described *(compare, Connolly v Macklowe Real Estate Co.,* 161 AD2d 520 [dismissal of Labor Law § 740 claim where plaintiff cited no authority for violations, nor did she describe how allegedly illegal activities imperil public health and safety]). Because the complaint is grounded in numerous actual violations, it is distinguishable from *Bordell (supra)* and sufficient to state a claim under section 740.

The hospital also challenges the sufficiency of the complaint on the grounds that it does not set forth a substantial and specific danger to the public health and safety *(Remba v Federation Empl. & Guidance Serv.,* 76 NY2d 801). As far as defendant challenges the nature of the cited violations, this is not a case of financial irregularities or improper accounting for which courts have uniformly declined to extend protection to whistleblowers under the statute *(see, Remba v Federation Empl. & Guidance Serv., supra; see also, Lamagna v New York State Assn. for Help of Retarded Children,* 158 AD2d 588; *Leibowitz v Bank Leumi Trust Co., supra).*

There can be little doubt that public health and safety are substantially and specifically implicated. The risk of death or injury to patients attended by negligent, poorly trained, and undisciplined EMS paramedics is exactly the type of public health risk necessary for the application of Labor Law § 740.

As to the breadth of the violations cited by plaintiff, the hospital contests the sufficiency of the complaint by casting the egregious behavior of the paramedics responding to the Reckleff call as a unique, closed-ended isolated incident, arguing that it does not meet the required demonstration of a threat to the public *(see, Kern v DePaul Mental Health Servs.,* 152 AD2d 957, *lv denied* 74 NY2d 615 [isolated incident of patient neglect poses no threat to public safety]; *see also, Easterson v Long Is. Jewish Med. Ctr.,* 156 AD2d 636, 637, *lv denied* 76 NY2d 704 [failure to turn over medical records does not pose a threat to the public at large]). The hospital's narrow view fails to comprehend that the mishandled EMS call ending in the death of Joan Reckleff was not an aberration, but a manifestation of a larger problem, which may not yet have been solved. There is no indication in the record that the offending paramedics were either disciplined or retrained

by the hospital. They may well still be staffing EMS ambulances. In this situation, the fact that another, similar, ambulance mishap is a probability, but not a certainty is not fatal to plaintiff's claim. The danger posed by the recurrence of a mishandled EMS call could hardly more clearly meet the required threat to public health and safety to satisfy the statute.

Accordingly, the order of the Supreme Court, New York County (Angela M. Mazzarelli, J.), entered June 2, 1994, which denied defendant's motion to dismiss the complaint, should be affirmed, without costs.

SULLIVAN, J. P., WALLACH and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered June 2, 1994, affirmed, without costs.