■ BARBARA KRAUS et al., Respondents-Appellants, v NEW ROCHELLE HOSPITAL MEDICAL CENTER, Appellant-Respondent. [628 NYS2d 512] —In an action to recover damages, *inter alia,* for wrongful termination of employment, (1) the defendant appeals, as limited by its notice of appeal and brief, from so much of an order of the Supreme Court, Westchester County (Nicolai, J.), entered July 13, 1993, as, after a nonjury trial, awarded the plaintiff Barbara Kraus $703,250 in damages for past and future earnings and fringe benefits, plus reasonable costs, disbursements, and attorney's fees on her cause of action under Labor Law § 740, and (2) the plaintiffs cross-appeal, as limited by their notice of appeal and brief, from so much of the same order as (a) dismissed their cause of action for punitive damages, (b) dismissed the plaintiff Barbara Kraus' cause of action for reinstatement, and (c) reduced the award for lost wages by the income earned by Mrs. Kraus after she was terminated.

■ BARBARA KRAUS et al., Respondents-Appellants, v NEW ROCHELLE HOSPITAL MEDICAL CENTER, Appellant-Respondent. [628 NYS2d 360] —In an action to recover damages for wrongful termination of employment, etc., the defendant appeals, as limited by its notice of appeal and brief, from so much of a judgment of the Supreme Court, Westchester County (Nicolai, J.), dated September 16, 1994, as is in favor of the plaintiff Barbara Kraus in the principal sum of $703,250 for past and future wages and fringe benefits, attorney's fees in the principal sum of $557,800, and disbursements in the principal sum of $29,400, and the plaintiffs cross-appeal, as limited by their notice of appeal and brief, from so much of the same judgment as, in effect, (a) dismissed their cause of action for punitive damages, (b) dismissed the cause of action of the

plaintiff Barbara Kraus for reinstatement to her position, and (c) reduced the award for lost wages by the income earned by Mrs. Kraus after she was terminated. The plaintiffs' notice of cross appeal from the order dated July 13, 1993, is deemed a premature notice of appeal from the judgment (CPLR 5520 [c]).

Ordered that the judgment is modified, on the law and the facts, and as a matter of discretion, by (1) deleting so much of the first decretal paragraph thereof as awarded damages for future wages and future fringe benefits, (2) deleting so much of the third decretal paragraph thereof as awarded counsel fees in the principal sum of $478,450 for the period December 8, 1990, to September 3, 1993, and in the principal sum of $79,350 for the period October 13, 1993 to February 16, 1994, and substituting therefor a provision awarding counsel fees in the principal sum of $250,000 for the period December 8, 1990, to September 3, 1993, and in the principal sum of $59,066 for the period October 13, 1993, to February 16, 1994, (3) deleting so much of the fifth decretal paragraph thereof as awarded disbursements in the principal sum of $28,000 for the period December 8, 1990 to September 3, 1993, and substituting therefor a provision awarding disbursements in the principal sum of $20,000 for that period, and (4) adding thereto a decretal paragraph directing the defendant to reinstate the plaintiff Barbara Kraus to her position as vice-president of nursing. As so modified, the judgment is affirmed insofar as appealed and cross-appealed from, without costs or disbursements, and the matter is remitted to the Supreme Court, Westchester County, for entry of an appropriate amended judgment.

The plaintiff Barbara Kraus was employed by the defendant, New Rochelle Hospital Medical Center (hereinafter the hospital), as vice-president of nursing beginning in 1981. On October 14, 1987, several nurses working in the intensive care unit (hereinafter ICU) of the hospital reported to Mrs. Kraus, their supervisor, that Dr. Robert Brandstetter had written on the charts of four patients that he had performed bronchoscopies on them. Dr. Brandstetter, an attending physician who practiced as a pulmonologist or pulmonary consultant, was also employed by the hospital as the Assistant Director of Medicine and Associate Director of its residency program. The nurses told Mrs. Kraus that Dr. Brandstetter had not performed the alleged procedures and/or had not obtained informed consents from the patients or their relatives for the procedures. According to Mrs. Kraus, she verified that the alleged procedures had not been performed and that informed consents had not been obtained or that Dr. Brandstetter had forged signatures on the informed consent forms.

Mrs. Kraus reported the nurses' information to Dr. Frank Iaquinta, the Director of Medicine who was Dr. Brandstetter's superior. She also reported the alleged incidents to the vice-president of the hospital, Mr. Carmen Alecci, since the president of the hospital, Mr. George Vecchione, was absent. Mrs. Kraus reported to Mr. Vecchione in the regular course of her duties. Both Mr. Alecci and Mr. Vecchione testified that Mrs. Kraus acted appropriately and within the normal scope of her duties in reporting what the nurses had told her.

The hospital did not seek to have the alleged incidents investigated by the hospital's Quality Assurance Committee. Rather, it referred the matter to the Medical Board, a body which represents all the physicians of the hospital. The Medical Board formed an ad hoc committee to investigate the alleged incidents. This committee consisted wholly of physicians from the department of medicine and were, therefore, colleagues and subordinates of Dr. Brandstetter. Without interviewing Mrs. Kraus, the nurses, the patients involved, or their relatives, the ad hoc committee prepared a report which absolved Dr. Brandstetter of any wrongdoing. Yet, even that report acknowledged that Brandstetter had not obtained proper informed consents.

The Law Committee of the Board of Governors, the hospital's ruling body, rejected the ad hoc committee's report, noting that the ad hoc committee had not conducted a thorough investigation. The Law Committee then recommended that the matter be referred back to the ad hoc committee to conduct a proper investigation. Thereafter, the Board of Governors referred the matter back to the ad hoc committee. Subsequently, the ad hoc committee prepared an addendum to its report which criticized Dr. Brandstetter for having been "casual" in obtaining the informed consents from the patients and for failing to enter in the log book his use of the bronchoscopy equipment, but it still absolved him of wrongdoing. The Board of Governors accepted the ad hoc committee's report.

In December 1987, the Medical Board held a meeting. Mrs. Kraus had attended the Medical Board meetings ever since she was employed. On this occasion, the President of the Medical Board, Dr. Emil Maffucci, who was also a member of the hospital's Board of Governors, invited Dr. Brandstetter to speak at the meeting. In his speech, Brandstetter referred to "frightening actions", "witch hunts" and irresponsible use of power by individuals in senior management, a clear reference to Mrs. Kraus.

Thereafter, also in December 1987, based on an anonymous

telephone call, the New York State Department of Health conducted an investigation of the hospital, which resulted in the issuance of a Statement of Deficiencies, all founded on Dr. Brandstetter's conduct on October 14, 1987.

Apparently, the fact that Mrs. Kraus reported the allegations against Dr. Brandstetter to the hospital administration enraged the physicians at the hospital, resulting in a restive atmosphere. The nurses at the hospital rallied to the support of their leader, Mrs. Kraus. On February 3, 1988, Mrs. Kraus was told to leave the meeting of the Medical Board because it was going into executive session. This had never happened before. After Mrs. Kraus left the meeting the Medical Board unanimously passed a "vote of no confidence" in Mrs. Kraus and sought to publish the vote in a newsletter to be distributed throughout the hospital. While the hospital privately supported Mrs. Kraus' action, it refused and/or failed to publicly do so, and denied Mrs. Kraus' implicit request to halt publication of the hospital's newsletter containing minutes of the Medical Board's meeting and the vote of no confidence.

After publication of the newsletter, Mrs. Kraus commenced an action against several doctors and the hospital to recover damages, *inter alia,* for defamation, conspiracy, and prima facie tort. Thereafter, the hospital reactivated a defunct Special Review Committee (hereinafter SRC) to investigate and report on what led to the vote of no confidence. Without speaking with Mrs. Kraus, the SRC concluded that Mrs. Kraus was rigid, inflexible, difficult to get along with, confrontational, and not a team player. Prior to reporting the Brandstetter incident, Mrs. Kraus had been evaluated as "above average", had received several accolades from the president of the hospital, and several improvements at the hospital had been attributed largely to her efforts.

Mrs. Kraus was terminated on June 6, 1988 based on the recommendation of the SRC, on the ground that she had failed to meet with the SRC when requested to do so. She then amended her complaint to add a cause of action against the hospital to recover damages for violation of Labor Law § 740.

The instant appeal by the hospital is from so much of the judgment as awarded Mrs. Kraus damages in the form of past and future earnings and fringe benefits, as well as attorney's fees and disbursements, based on a decision and order dated July 13, 1993, which found that the hospital had terminated her employment because she reported the Brandstetter incidents and that her dismissal violated Labor Law § 740. The plaintiffs' cross appeal is from so much of the judgment as, in

effect, dismissed their causes of action to recover punitive damages, and to compel the defendant to reinstate Mrs. Kraus to her position, and reduced the award for lost wages by the income earned by Mrs. Kraus after she was terminated.

Contrary to the defendant's contentions we find that the evidence was sufficient, as a matter of law, to establish a violation of Labor Law § 740.

Labor Law § 740 (2) provides, in pertinent part, that "[a]n employer shall not take any retaliatory personnel action against an employee because such employee * * * (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety * * * or (c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation." Thus, in order to establish a violation of this section, a plaintiff must prove that the activity, policy or practice that she objected to, refused to participate in, disclosed or threatened to disclose: (a) was an activity, policy or practice of the employer, (b) that the activity, policy or practice constituted an actual violation of law, rule or regulation (see, Bordell v General Elec. Co., 208 AD2d 219; Connolly v Macklowe Real Estate Co., 161 AD2d 520; Remba v Federation Empl. & Guidance Serv., 149 AD2d 131, affd 76 NY2d 801), and (c) the violation is one that creates and presents a substantial and specific danger to the public health or safety (see, Remba v Federation Empl. & Guidance Serv., 76 NY2d 801, supra; Easterson v Long Is. Jewish Med. Ctr., 156 AD2d 636; Kern v DePaul Mental Health Servs., 152 AD2d 957; Leibowitz v Bank Leumi Trust Co., 152 AD2d 169).

Here, Dr. Brandstetter's hybrid role at the defendant hospital renders him more of an employee than an independent contractor. In his capacity as Assistant Director of Medicine and Associate Director of the residency program, Dr. Brandstetter was paid a salary by the hospital, and he engaged in the general administration of those departments under him, including the re-credentialing of physicians of the hospital. Moreover, it was the hospital to which the New York State Department of Health issued a Statement of Deficiencies concerning violations of patients' rights as a result of Dr. Brandstetter's conduct. His roles at the hospital were so inextricably intertwined as to lead to the reasonable conclusion that he was an employee of the hospital for all purposes.

Dr. Brandstetter's failure to properly document his patients'

charts and his failure to obtain their informed consents constituted violations of the regulations of the Commissioner of Health of the State of New York *(see,* 10 NYCRR 405.7 [b] [9]; 405.10, 405.10 [b] [3] [iii], [v], [vi]).

The evidence also showed that a bronchoscopic procedure can result in death, cardiac arrest, and hemorrhage. The testimony by several nurses, as well as Dr. Iaquinta, also indicated that proper chart documentation was necessary for the nurses to determine an appropriate care plan, to monitor the patient's condition, and to know what measures to take in the event of emergency. We cannot but reasonably conclude that the failure to properly document and/or obtain informed consents for a procedure which can be fatal created a substantial and specific danger to the public health and safety *(see, Frazier v King,* 873 F2d 820, *cert denied sub nom. Davoli v Frazier,* 493 US 977).

Under all the circumstances of this case the plaintiff should have been reinstated to her position. Moreover, the trial court erred in awarding the plaintiff lost future earnings and fringe benefits, since the statute does not authorize recovery of future lost wages and future lost benefits *(see, Hoffman v Altana, Inc.,* 198 AD2d 210). However, the court properly dismissed the plaintiff's cause of action to recover punitive damages *(see, Gruenewald v 132 W. 31 St. Realty Corp.,* 205 AD2d 498; *Bompane v Enzolabs, Inc.,* 160 Misc 2d 315; *see also, Scaduto v Restaurants Assocs. Indus.,* 180 AD2d 458).

We further find that the attorney's fees and disbursements awarded by the trial court are excessive to the extent indicated.

We have considered the parties' remaining contentions and find them to be without merit. Pizzuto, J. P., Hart, Friedmann and Florio, JJ., concur.