730 A.2d 327

JOSEPHINE C. HIGGINS AND JOSEPH A. HIGGINS, JR., PLAINTIFFS-APPELLANTS, v. PASCACK VALLEY HOSPITAL; DOROTHY VOORMAN-FISH; GARY DEL MORO; MYRON HOROWITZ; LOUIS YCRE AND DANIEL DESANTIS, DEFENDANTS-RESPONDENTS.

Argued February 1, 1999—Decided June 10, 1999.

*Paul Schachter,* argued the cause for appellants (*Reinhardt & Schachter,* attorneys; *Denise Reinhardt* of counsel; *Ms. Reinhardt* and *Andrew W. Dwyer,* on the briefs).

*John H. Schmidt, Jr.,* argued the cause for respondents (*Lindabury, McCormick & Estabrook,* attorneys; *Mr. Schmidt, Richard J. Cino, Kathleen Connelly–Agnostak* and *Athina Lekas,* on the brief).

*Christopher P. Lenzo,* argued the cause for *amicus curiae,* National Employment Lawyers Association of New Jersey (*Francis, Lenzo & Manshel,* attorneys; *Mr. Lenzo, Patricia Breuninger* and *Bennet D. Zurofsky,* of counsel).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue is whether the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, prohibits an employer from retaliating against an employee who "blows the whistle" on a co-employee.

Plaintiff Josephine Higgins complained to her supervisors about misconduct by two of her co-employees, Bruce Contini and Peter

Fromm. She argues that her employer, Pascack Valley Hospital ("the Hospital") retaliated against her by temporarily transferring her from the Hospital's Mobile Intensive Care Unit ("MICU"), reducing her work hours, and denying her a promotion. Higgins instituted an action in the Law Division asserting claims for violation of the CEPA, defamation, and intentional infliction of emotional distress. She seeks both compensatory and punitive damages. In addition to naming the Hospital as a defendant, she ultimately joined Dorothy Voorman–Fish, Gary Del Moro, Myron Horowitz, Louis Ycre, and Daniel DeSantis ("the individual defendants"), the supervising employees whom she claims engaged in the retaliatory conduct.

After the jury returned a verdict for Higgins on the CEPA claim, the trial court entered judgment against the Hospital. The court explained that to be liable for retaliation against an employee who complains about a co-employee's misconduct, the employer must be complicit in the misconduct. [As the court read the CEPA, the statute does not protect any employee who complains about a co-employee's misconduct, absent employer complicity.] Here, the court found "ample evidence" of employer complicity.

The Appellate Division agreed with the Law Division's conclusion that, absent employer complicity, the CEPA does not protect an employee who complains about misconduct of co-employees. 307 *N.J.Super.* 277, 296–97, 704 *A.*2d 988 (App.Div.1998). According to the Appellate Division, however, the jury instructions erroneously stated that the employer could be liable even if not complicit in the co-employees' misconduct. *Id.* at 297–300, 704 *A.*2d 988.

Thus, the primary issue on this appeal is whether the CEPA imposes liability on an employer for retaliating against a complaining employee when the employer was not complicit in the conduct of co-employees about which the employee complained. An additional issue is whether the trial court adequately charged the jury on the liability of the employer. A third issue concerns the liability of the individual defendants. Based on the jury verdict, the Law Division entered judgment on the CEPA claim against

the Hospital, but not against the individual defendants. The Appellate Division reversed the judgment against the Hospital, *id.* at 300, 704 *A*.2d 988, and dismissed Higgins's defamation claim. *Id.* at 302–04, 704 *A*.2d 988.

We granted Higgins's petition for certification. 156 *N.J.* 405, 719 *A*.2d 637 (1998). We hold that the CEPA protects an employee who, with a reasonable basis, complains to his or her employer about the misconduct of co-employees, even in the absence of employer complicity in the misconduct. Based on the jury's answers to the special verdict form, judgment on the CEPA claim was properly entered against the Hospital, but not against the individual defendants. Finally, we affirm the dismissal of Higgins's defamation claim.

## I.

In May 1985, Higgins began working as a part-time nurse in the MICU, which responds to calls for on-scene medical treatment. The MICU is comprised of Mobile Intensive Care Nurses (MICNs) and Mobile Intensive Care Paramedics (MICPs).

As an "unscheduled, per diem nurse," Higgins worked not a fixed schedule, but at the Hospital's discretion. Accordingly, the Hospital could assign Higgins periodically to staff the Hospital's emergency room.

In 1991 and 1992, Higgins complained to her supervisor at the Hospital about two separate incidents. Higgins's first complaint alleged that two MICPs, Contini and Fromm, filed the wrong forms after treating a patient. While serving as a volunteer for the Triboro Volunteer Ambulance Corps. in November 1991, Higgins went in an ambulance to the home of two firemen, Kenny Steele and his father. The two firemen had been injured during a drill. When Higgins arrived at the scene, she treated the son, Kenny, for smoke inhalation.

A Hospital MICU ambulance, staffed by Contini and Fromm, also responded to the call. According to Contini and Fromm, they

originally were dispatched to treat a patient suffering respiratory distress. While going to the scene, they received a second dispatch that another patient at the same address needed medical attention. When Contini and Fromm reached the Steele home, police told them that the second patient, Kenny's father, did not require assistance. Contini and Fromm limited their treatment to Kenny. On determining that Kenny did not require immediate advanced life support, they discharged him to Higgins's ambulance for transport to the Hospital.

When Higgins reported for duty at the Hospital approximately one week later, she checked the MICU log to see what had happened to Kenny. The log indicated that the MICU call had been canceled before Contini and Fromm arrived at the scene, and that they had never treated Kenny. Consequently, Higgins concluded that Contini and Fromm had failed to complete the appropriate forms.

In accordance with state regulations, Hospital rules require MICPs and MICNs, after completing an MICU call, to fill out either a "white sheet" or a "blue sheet." If the MICU arrives at the scene and provides treatment, the MICNs and MICPs should complete a white sheet. If the call is canceled before the MICU reaches the scene, the MICNs and MICPs should complete a blue sheet. Higgins ascertained that Contini and Fromm had filed a blue sheet. Because they had treated Kenny, they should have filed a white sheet.

Higgins reported her findings to her supervisor, defendant Gary Del Moro, Coordinator and Assistant Director of the MICU. Del Moro had held a meeting two months earlier to remind the MICU staff of the importance of completing accurate paperwork. Prior to that meeting, two MICNs, who had filed a blue sheet instead of a white sheet after treating a patient, had been fired. Del Moro told Higgins that he would investigate her complaint.

In response to questions from Del Moro, Fromm said he had completed the correct forms. Del Moro advised defendant Dorothy Voorman–Fish, the President of Nursing Services, of the

potential infraction. The next morning, Del Moro checked the paperwork but, like Higgins, could find only the blue sheet. He then called the dispatching agency and confirmed that there had been dispatches for two people at the same address. Eventually, Del Moro found the white sheet in Kenny's medical file in the Hospital Records Department. Although the dispatch report was missing, the white sheet was otherwise complete.

According to Fromm, Contini had completed a blue sheet, indicating that the call concerning Kenny's father had been "canceled upon arrival." Later that evening, Fromm completed a white sheet, indicating that Kenny had been treated for smoke inhalation. Fromm explained that he had failed to put the dispatch number on the white sheet because he did not have his log book with him. Although Fromm intended to put the white sheet in the MICU coordinator's box, he inadvertently left it in the emergency room.

Contini substantially corroborated Fromm's account. Contini confirmed that he had filled out a blue sheet for the canceled second call. According to Contini, he had told Higgins that the white sheet had been completed properly. Higgins, however, testified that Contini had told her that the white sheet had been fabricated after she filed her complaint.

Del Moro summarized the results of his investigation in a memorandum to Voorman–Fish in December 1991. He recommended that Contini and Fromm should be absolved of any wrongdoing. Del Moro's report also stated in part:

[Higgins's] actions have markedly polarized this MICU. Several staff have refused to work with her, [o]thers have elected to confront her. My clinical evaluation of Josephine is that of an employee that meets expectations, however, this type of unsubstantiated accusations [sic] in addition to [Higgins's] history of not following the chain of command makes her a less than desirable employee.

Voorman–Fish thereafter reviewed MICU reports from the preceding six months to ascertain whether the MICU was complying with Hospital policies.

After completion of the investigation, Higgins met with Del Moro and Voorman–Fish. They showed Higgins the white sheet

and told her that Contini and Fromm had asked that they no longer be scheduled to work with her. According to Higgins, Del Moro and Voorman–Fish criticized, but did not discipline, her for making the complaint.

Higgins's second complaint alleged that Fromm had stolen medication from a patient. In January 1992, Higgins and Fromm were dispatched to the home of a patient who was experiencing chest pains. When they arrived at the scene, Higgins attended to the patient, and Fromm stood across the bed taking notes. While Higgins attempted to insert an intravenous line into the patient's arm, she saw Fromm open a bottle of the patient's prescription medication, empty the pills into his hand, and place them into his pants pocket. Higgins neither informed the police officers who were at the scene nor confronted Fromm about the incident. She explained, "I was taking care of my patient and I was trying to think through what I had just seen."

On arrival at the Hospital, Higgins notified Linda Sacchieri, the on-duty nursing supervisor. Sacchieri told Higgins that she would "handle the situation" and that Higgins should return to work. Sacchieri and another supervisor, after reporting the incident to Voorman–Fish, questioned Fromm. Fromm showed that he had nothing in his pockets and denied taking the drugs.

Pursuant to instructions from Voorman–Fish, Del Moro obtained statements from the Paramus police and ambulance squads that had been at the patient's home with Higgins and Fromm. No one corroborated Higgins's claim.

Voorman–Fish also telephoned Higgins and asked her to submit a written statement about the incident. Higgins said that she would not submit a report until she spoke with her attorney. When Voorman–Fish did not receive anything in writing from Higgins, Voorman–Fish wrote a letter to Higgins chastising her for not responding. In fact, Higgins did respond in a letter dated January 16, 1992, which was found on a desk in the nursing office on January 17, 1992.

At trial, Fromm denied taking the patient's drugs. He acknowledged emptying the medicine bottle, but explained that he did so to determine whether the patient had taken the correct dosage. Fromm made this determination by examining the date on the bottle and then counting the remaining pills. He returned the bottle. As he explained, it "would have been irresponsible" not to check the patient's medication.

Following its investigation, the Hospital concluded that Fromm had not taken medication from the patient. Because the Hospital did not ask Higgins to participate in the investigation, she concluded that it was "whitewashed."

Voorman–Fish informed Higgins of the results of the investigation in a letter dated February 14, 1992:

We have looked into your allegations concerning Peter Fromm, MICP, and to-date, can find nothing to substantiate an improper act of the nature you note on his part. Given the lack of corroboration and with due respect for the level of professional conduct Mr. Fromm has exhibited while in our employ, I find no reason to pursue this matter further.

If you are able to present corroborative evidence of any nature bearing on this matter, please contact me.

Shortly thereafter, seven MICU nurses and paramedics, including Fromm, sent Del Moro letters stating that they did not want to be scheduled with Higgins. They no longer trusted her and feared that she would falsely accuse them. The letters also expressed anger that, contrary to the nursing code of ethics, Higgins did not speak with Fromm before accusing him of taking the pills.

On January 27, 1992, Voorman–Fish met with Higgins, Del Moro, and a representative of Higgins's union, as well as defendants DeSantis, Director of Personnel; Horowitz, Director of Labor Relations; and Ycre, the Hospital President. Voorman–Fish showed Higgins the letters and told her that she was being transferred temporarily from the MICU to the emergency room "to allow the emotions to subside and collegiality to return to the unit."

Voorman–Fish followed up the meeting with a letter to Higgins:

As I stated to you at our meeting Tuesday morning, I have received individual written requests from almost all the MICU personnel that you not be assigned to ride with them. Accordingly, I must require that you perform your duties as an unscheduled per diem nurse in the Emergency Room until further notice. I will maintain this position until a sufficient number of MICU personnel express a willingness to be assigned as your MICU partner for scheduling purposes.

Although working in the Emergency Room is currently a part of the expectations of your position as an MICN, the Hospital will provide you with additional orientation and you will have the opportunity to work, on the average, the same number of hours as you had been assigned on the MICU so that your earning ability remains unaffected.

This decision is an administrative act on my part to insure a smoothly functioning MICU and is not to be construed as discipline or a reprimand of any sort. My single interest and responsibility is that quality patient care continues to be delivered to those who require it.

Higgins denied receiving this letter. She also contended that the Hospital orchestrated the staff's reaction.

After Higgins spent one day in her new position, her union representative advised her not to return to the emergency room. Approximately two weeks later, Higgins returned to the MICU as a "third member" of an MICU team, a position usually held by a trainee or observer. Later in the year, Higgins was reinstated as one of the two principal riders in an MICU ambulance. Although Del Moro denied intentionally reducing Higgins's hours, Higgins claimed that she "was working far less" than before.

At trial, Higgins also questioned the Hospital's failure to hire her for either of two full-time MICU positions for which she applied in January and February 1992. The Hospital awarded one position to Contini and eliminated the other position.

On January 20, 1993, Higgins filed a complaint against the Hospital and the individual defendants. Higgins alleged violations of the CEPA, intentional infliction of emotional distress, and defamation. She also asserted several other common-law tort causes of action that were dismissed prior to trial. At the end of Higgins's case, defendants moved to dismiss the remaining claims. Defendants specifically argued that the court should dismiss the CEPA claim because the CEPA does not apply to employees who complain about co-workers. The trial court denied the motion to

dismiss the CEPA and defamation claims, but dismissed the intentional-infliction-of-emotional-distress claim.

The court instructed the jury on Higgins's CEPA claim:

[P]laintiff, Josephine Higgins, has alleged that she was retaliated against because she objected to or refused to participate in an activity, policy, or practice which plaintiff, Josephine Higgins, reasonably believed was a past, present, or potential continuing violation of the law, rule, or a regulation promulgated pursuant to law; fraudulent or criminal; or, incompatible with a clear mandate of public policy concerning the health, safety, or welfare [ ] of the public. To prevail on this claim, the plaintiff, Josephine Higgins, has the burden of showing by a preponderance of the evidence that she reasonably believed that an activity, policy, or practice of the defendant in violation of the law, and in that case, she alleged that she observed a co-worker taking medications from a patient. . . .

And these allegations also fall [within] the purview of incompatibility with a clear mandate of public policy concerning the public health, safety, or welfare, in that, plaintiff has alleged and has to prove that allegation that [ (1) ] control of and documentation relating to the patient's prescription medication in her home was not followed; [ (2) ] She objected to or refused to participate in that activity or practice; (3) That retaliatory action was taken against her by way [of] an adverse employment action; and (4), that were was a causal link between the plaintiff, Josephine Higgins, reporting and the retaliatory or adverse action of the defendant. She has to prove all four of those elements.

To establish the first element of her claim, it is the plaintiff, Josephine Higgins' burden to prove ... [s]he had a reasonable belief that the activity, policy, or practice of the defendant through the employees was in violation of the law, rule or regulation; was fraudulent or criminal; was incompatible with a clear mandate of public policy concerning the public health, safety, or welfare of patients.

. . . .

Plaintiff cannot prove her claim of retaliation merely by conclusory statements or by speculating that the action taken against her was in response to her objections to or refusal to participate in the activity, policy, or practice of the employer as [ ] condoned by the defendant, Pascack Valley Hospital, because, obviously, the hospital can only act through its employees and its administration. So that's why I say it has to be shown that it was acts condoned by the defendant, Pascack Valley.

The jury found for Higgins on the CEPA and defamation claims. It awarded her $315,000 in compensatory damages, consisting of $225,000 for lost wages and benefits on her CEPA claim ($200,000 for denial of promotion and $25,000 for lost hours), $45,000 for emotional distress on the CEPA claim, and $50,000 for harm to plaintiff's professional reputation as a result of defamation. The jury also awarded Higgins $320,000 in punitive damages. The trial court reduced the jury's award for lost hours from

$25,000 to $4500, and awarded Higgins an additional $200,816 in attorney's fees, $11,885 in costs, and $26,082 in pre-judgment interest.

The court ruled that the CEPA does not impose personal liability on a co-employee or supervisor who engages in retaliatory conduct. Consequently, the court dismissed the CEPA claims against the individual defendants. It entered judgment against only the Hospital for the compensatory damages arising from the CEPA claim, the punitive damages, and the award of attorney's fees, costs, and interest. Del Moro and Voorman–Fish, however, remained jointly and severally liable with the Hospital for the defamation claim.

The court denied defendants' motion for a judgment notwithstanding the verdict on the CEPA claim. It repeated that the CEPA applies only if the employer is involved in the challenged conduct of the co-employees. It concluded, however, that "there was ample evidence on this record to show the employer's complicity.... [I]f it were an initial complaint against a co-employee, it does not refute the fact of an employer's responsibility under CEPA where the employer does nothing to rectify the obvious illegal activity that is being complained about."

The Appellate Division agreed that Higgins could recover under the CEPA only if the "hospital, through its supervisors ..., condoned and ratified that conduct by whitewashing the investigation." 307 *N.J.Super.* at 297, 704 *A.2d* 988. Finding that the jury instructions on employee complicity were deficient, the Appellate Division reversed the judgment against the Hospital and remanded for a new trial. The Appellate Division also dismissed the defamation claim, but did not comment on the dismissal of the judgment against the individual defendants.

## II.

The purpose of the CEPA is to "protect employees who report illegal or unethical work-place activities." *Barratt v. Cushman & Wakefield,* 144 *N.J.* 120, 127, 675 *A.2d* 1094 (1996). Generally speaking, the CEPA codified the common-law cause of

action, first recognized in *Pierce v. Ortho Pharm. Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980), which protects at-will employees who have been discharged in violation of a clear mandate of public policy. Thus, the CEPA establishes a statutory exception to the general rule that an employer may terminate an at-will employee with or without cause. *See id.* at 65, 417 *A.*2d 505.

A question has arisen, however, whether the CEPA's protection extends to an employee's complaints about not the employer, but a co-employee. The Appellate Division has ruled that the CEPA does not protect an employee who objects to the wrongful conduct of a fellow employee. *See, e.g., Roach v. TRW, Inc.*, 320 *N.J.Super.* 558, 727 *A.*2d 1055 (App.Div.1999) (reversing jury verdict that defendant violated CEPA by terminating employee who objected to illegal activities of co-employees because CEPA does not protect "disclosure of employee activities victimizing the employer"); *Demas v. National Westminster Bank*, 313 *N.J.Super.* 47, 51, 712 *A.*2d 693 (App.Div.1998) (affirming summary judgment entered against plaintiff who claimed that supervisor harassed her after she reported that co-worker had violated bank policies and banking and security regulations because "the conduct upon which plaintiff alleges she blew the whistle was not conduct attributable to her employer"), *petition for certif. filed* (Aug. 7, 1998); *see also Littman v. Firestone Tire & Rubber Co.*, 715 *F.Supp.* 90, 93 (S.D.N.Y.1989) (dismissing CEPA claim asserted by employee who exposed alleged fraudulent activities by co-employees because "fraud directed solely at the company ... is not the type of activity the statute was designed to combat, or whose disclosure the statute was designed to protect").

■ Our primary goal when interpreting the CEPA, as when interpreting any statute, is to determine the Legislature's intent. *See State v. Gonzalez*, 142 *N.J.* 618, 627, 667 *A.*2d 684 (1995); *Young v. Schering Corp.*, 141 *N.J.* 16, 25, 660 *A.*2d 1153 (1995). The analysis begins with the language of the statute. *State v. Kittrell*, 145 *N.J.* 112, 122–23, 678 *A.*2d 209 (1996). If the statutory language is clear, that language ordinarily governs. *Board of*

*Educ. v. Neptune Township Educ. Ass'n,* 144 *N.J.* 16, 25, 675 *A.*2d 611 (1996).

With these basic principles in mind, we turn to *N.J.S.A.* 34:19–3, which provides:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of a law, or a rule or regulation promulgated pursuant to law by the employer; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare.

A plain reading of the statute suggests that the CEPA covers employees who object to the conduct of co-workers. The term "any" in subsection "c" indicates that the statute applies regardless of the source of the activity, policy or practice. Although subsections "a" and "b" limit the statute's application to policies, practices and activities "of" or "by" "the employer," subsection "c" contains no such limitation. The omission of the phrase "of the employer" in subsection "c" is too obvious to ignore. *See Abbamont v. Piscataway Township Bd. of Educ.,* 138 *N.J.* 405, 426, 650 *A.*2d 958 (1994) (finding that where no specific CEPA provision precludes awarding punitive damages against public employers, "[t]hat omission must be deemed purposeful"). When "the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 307–08, 625 *A.*2d 468 (1993); *see also State v. Hoffman,* 149 *N.J.* 564, 579, 695 *A.*2d 236 (1997).

Defendants contend, to the contrary, that the legislative history demonstrates an intent to limit the CEPA's application to com-

plaints concerning employer conduct. The Legislature originally enacted the CEPA in 1986. *L.* 1986, *c.* 105, § 3a. In 1989, the Legislature amended the CEPA "to protect employees from retaliation for disclosure about [ ] an activity, policy or practice of 'another employer, with whom the employee's employer has a business relationship . . . .' " *Barratt, supra,* 144 *N.J.* at 128, 675 *A.*2d 1094 (quoting *L.* 1989, *c.* 220, § 1). Unfortunately, the legislative history of the original bill and the 1989 amendment is meager. *Young, supra,* 141 *N.J.* at 24, 660 *A.*2d 1153.

When signing the original CEPA bill, Governor Kean stated:

It is most unfortunate—but, nonetheless, true—that conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity on the part of his or her employer. It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.

[Office of the Governor, News Release at 1 (Sept. 8, 1986).]

Concerning the 1989 amendment, the Assembly Labor Committee stated:

Under current law, an employee is protected against retaliation only with regard to the disclosure or threatened disclosure of information about his employer and public policies concerning the health, safety or welfare of the public.

[Assembly Labor Committee Statement No. 661, *L.* 1989, *c.* 220.]

Those brief statements leave open the question whether the Legislature intended that the CEPA should extend also to employees who complain not about their employer, but about co-employees. In answering that question, we turn to the statute's purpose, which was to enact "broad protections against employer retaliation" for employees who act in the public interest. *Mehlman v. Mobil Oil Corp.,* 153 *N.J.* 163, 179, 707 *A.*2d 1000 (1998). As remedial legislation, the statute "should be construed liberally to effectuate its important social goal." *Abbamont, supra,* 138 *N.J.* at 431, 650 *A.*2d 958. So viewed, the CEPA: prohibits employer retaliation against an employee who objects to an employer practice that violates a foreign country's public policy, as expressed in an industry safety guideline, even if the employee is unaware of the precise source of the public policy, *Mehlman, supra,* 153 *N.J.* at 188–90, 192–93, 707 *A.*2d 1000; protects an

employee who reports an illegal act of a minority partner, even if the partnership did not exist at the time of the wrongdoing, *Barratt, supra*, 144 *N.J.* at 128–30, 675 *A.*2d 1094; and permits an employee to pursue a common-law tort or contract claim that is distinct from the CEPA claim, *Young, supra*, 141 *N.J.* at 25–26, 660 *A.*2d 1153.

Misconduct of employees, like that of employers, can threaten the public health, safety, and welfare. Especially in hospitals and other health care institutions, a practice of a co-employee, like that of the employer, can threaten the health and safety of patients. For example, a paramedic's theft of patient medication, whether or not condoned by the hospital, could undermine public health. Sometimes, moreover, only an employee can bring a co-employee's wrongdoing to the attention of the employer or a public agency. If left unprotected, employees who otherwise would complain about a co-employee might hesitate to come forward out of fear of retribution. A vindictive employer could resent disruption in the workplace or the disclosure of improper practices within the organization. In this context, "reporting a fellow employee's violation . . . is not so different from traditional notions of whistle-blowing." *Dudewicz v. Norris–Schmid, Inc.*, 443 *Mich.* 68, 503 *N.W.*2d 645, 648 (1993).

Nothing indicates that the Legislature intended that the CEPA's expansive protection should depend on a strict parsing of employer and employee conduct. "The Legislature obviously intended to provide a comprehensive and effective cause of action for retaliatory discharge." *Young, supra*, 141 *N.J.* at 26, 660 *A.*2d 1153. A solitary employee may not be able to determine whether an illegal activity is the isolated act of a single co-employee or a systemic practice. When an employee complains of the wrongdoing, he or she may not know whether the employer will condone the act. Failure to protect complaining employees therefore will inhibit them from reporting practices for which they reasonably believe their employer is responsible.

That interpretation accords with the prevailing authority throughout the nation. Several state courts have construed similar "whistleblowing" statutes to protect employees who report the misconduct of co-employees. In *Dudewicz, supra,* 443 *Mich.* 68, 503 *N.W.*2d 645, the Michigan Supreme Court interpreted the Michigan Whistleblowers' Protection Act, *Mich.Comp.Laws Ann.* § 15.361 (West 1998), to prohibit an employer from taking retaliatory action against an employee who files a criminal complaint against a fellow employee. The Michigan statute protects an employee who "reports . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law." *Ibid.* As the Michigan Supreme Court found, "a plain reading of this provision reveals that protection is not limited to employee reports of violations by employers." *Dudewicz, supra,* 503 *N.W.*2d at 648. This plain reading was supported by the legislative analysis, which recognized that "employees are naturally reluctant to inform on an employer *or a colleague.*" *Ibid.*

In New York, the Appellate Division has reached a similar result. The New York Whistleblower Statute, *N.Y. Labor Law* § 740 (McKinney 1998), is substantially similar to the CEPA. New York courts have construed the statute to apply to complaints made against co-employees. In *Kraus v. New Rochelle Hosp. Med. Ctr.,* 216 *A.D.*2d 360, 628 *N.Y.S.*2d 360 (1995), the plaintiff, vice-president of nursing, was terminated after reporting to a doctor's superior that the doctor had performed procedures without obtaining the requisite informed consent from patients or their families. The court concluded that the plaintiff had established a violation of the Whistleblower Statute, and ordered the plaintiff reinstated to her position at the hospital. Similarly, in *Rodgers v. Lenox Hill Hosp.,* 211 *A.D.*2d 248, 626 *N.Y.S.*2d 137 (1995), the plaintiff, director of the Emergency Medical Service Department at Lenox Hill Hospital, was fired after investigating two paramedics who pronounced dead a patient who was in fact still alive. The trial court denied the hospital's motion to dismiss the plaintiff's claim under the whistleblower statute. In affirming, the Appellate Division concluded that the "plaintiff's claim falls within both the

letter and the spirit of the whistleblower statute." *Id.* at 139, 141. Although the New York Appellate Division did not explicitly address whether the whistleblower statute applies where an employee objects to the practices of a fellow employee, the outcome of these cases supports such coverage.

Additionally, several states' whistleblower statutes expressly protect employees who object to co-employees' activities. *See Cal. Gov.Code* § 8547.2 (West 1999) (protecting public employee who reports improper activity "by a state agency or by an employee"); *Fla. Stat. Ann.* § 112.3187(5)(a) (West 1998) (protecting public employee who discloses "any violation or suspected violation ... by an employee or agent of an agency...."); *N.C. Gen.Stat.* §§ 126–84, –85 (1998) (prohibiting retaliation against State employee who reports misconduct by "a State agency or State employee"); *Ohio Rev.Code Ann.* § 4113.52 (Banks–Baldwin 1998) (protecting employee who reports "violation by a fellow employee"); *Or.Rev.Stat.* § 659.550 (1998) (prohibiting retaliation against employee who reports "criminal activity by any person"); *S.C.Code Ann.* §§ 8–27–10, –20 (Law.Co-op.1998) (protecting State employee who reports wrongdoing by public body or public employee). Only one state statute explicitly limits protection to employees who complain about employer conduct. *See Fla. Stat. Ann.* § 448.102 (West 1998) (prohibiting retaliatory action against private-sector employee who "objects to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule or regulation").

Furthermore, the courts of Massachusetts and Illinois have stated that, even in the absence of a whistleblower statute, an employee who is terminated for reporting the illegal action of a coworker may maintain a common-law cause of action for wrongful discharge. *See Palmateer v. International Harvester Co.,* 85 *Ill.*2d 124, 52 *Ill.Dec.* 13, 421 *N.E.*2d 876 (1986) (finding that at-will employee dismissed for reporting suspected criminal activity by fellow employee to police stated claim for retaliatory discharge because "public policy favors the exposure of crime"); *Shea v.*

*Emmanuel College,* 425 *Mass.* 761, 682 *N.E.*2d 1348 (1997) (holding that at-will employee fired for reporting suspected criminal activity in her workplace to supervisor or public authority has cause of action for wrongful discharge, even if employer is victim of alleged criminal conduct).

In the present case, the Appellate Division misconstrued our opinion in *Abbamont* as subjecting the employer to liability under the CEPA only if the conduct about which the employee complained could be imputed to the employer. The Appellate Division concluded that the Hospital is not liable under the CEPA because the co-employee's alleged misconduct—theft of patient medication and falsification of Hospital records—"could not be considered to have been within the scope of the employee's authority or as in the fulfillment of the employer's business." 307 *N.J.Super.* at 296, 704 *A.*2d 988. The wrong imputed to the employer in *Abbamont,* however, was a school principal's and superintendent's failure to rehire a teacher because the teacher complained about the inadequate safety conditions of the school's metal shop, not the failure to maintain the metal shop. Similarly, in the present case, the wrong imputed to the Hospital is the retaliatory action against Higgins undertaken by the Hospital supervisors, the individual defendants. It is irrelevant that the alleged illegal acts of Contini and Fromm cannot be attributed to the Hospital.

We hold, therefore, that the CEPA prohibits an employer from taking retaliatory action against an employee who has a reasonable basis for objecting to a co-employee's activity, policy, or practice covered by *N.J.S.A.* 34:19-3. Filing a complaint, however, does not insulate the complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint. As a practical matter, a proper investigation by the employer should reveal whether the basis for the complaint is reasonable. The critical facts are those that relate directly to the reasonableness of the complaint. If credibility is a concern, other facts also could become relevant. Even when an employer conducts a thorough investigation of the alleged misconduct, the

evaluation of the employer's retaliatory conduct focuses not on the reasonableness of the employer's investigation, but on that of the underlying complaint. As long as a reasonable basis exists for a complaint about misconduct, whether of the employer or of a co-employee, the complaining employee should not be exposed to retaliation by the employer. An employer, however, retains the authority to dismiss an employee for filing a complaint that is not supported by an objectively reasonable basis.

In sum, the trial court did not commit reversible error by failing to instruct the jury that it could find the Hospital liable for the CEPA claim only if it first found that the Hospital was complicit in the co-employees' misconduct. The charge, moreover, adequately focused the jury's attention on the reasonableness of the basis for the complaint.

Accordingly, we reverse the judgment of the Appellate Division and reinstate the judgment entered in the Law Division finding the Hospital liable on the CEPA claim.

### III.

A second issue plaintiff raises on appeal is whether individual defendants who violate the CEPA may be held personally liable. We conclude that the record does not permit the entry of judgment against the individual defendants. Consistent with the summations and the jury instructions, the verdict form directed the jury to determine whether the actions of the Hospital alone violated the CEPA. The verdict form did not instruct the jury to consider the conduct of each individual defendant. Following that form, the jury found only the Hospital liable under the CEPA. We therefore affirm the dismissal of the CEPA claim against the individual defendants.

### IV.

The final issue concerns plaintiff's defamation claim. Higgins alleges that she was defamed by Voorman–Fish's letter to her.

The letter, which informed Higgins of the Hospital's conclusions after investigating her complaint against Fromm, was posted at the Hospital by an unidentified person, *see supra* at 414, 730 *A.*2d at 331. Higgins claims that she was defamed also by co-workers' letters, which expressed her co-workers' reluctance to work with her, *see supra* at 414, 730 *A.*2d at 332.

The Law Division denied defendants' motion for summary judgment on the defamation claim. Initially, the trial court concluded that "the [Voorman–Fish] letter is reasonably susceptible of a defamatory meaning.... [A] reasonable person could conclude that the reference to Mr. Fromm's professionalism implicitly questions that of Ms. Higgins." Later, in response to defendants' objection during plaintiff's summation, the court ruled that the Voorman–Fish letter on its own could not support a defamation claim because the letter merely was "a statement of fact about the ... result of an investigation." The court found, however, that plaintiff's defamation claim could rest on "the cumulative effect of the coworkers [and] the hospital administration." According to the court, the co-workers' letters, the Hospital's failure to respond to those letters, and Voorman–Fish's letter combined to portray Higgins as untrustworthy. The Appellate Division reversed, finding, as a matter of law, that no reasonable person could conclude that Higgins had been defamed.

A statement is defamatory if it "is false and 'is injurious to the reputation of another' or exposes another person to 'hatred, contempt or ridicule' or subjects another person to 'a loss of the good will and confidence' in which he or she is held by others." *Romaine v. Kallinger*, 109 *N.J.* 282, 289, 537 *A.*2d 284 (1988) (quoting *Leers v. Green*, 24 *N.J.* 239, 251, 131 *A.*2d 781 (1957)). "Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court." *Ward v. Zelikovsky*, 136 *N.J.* 516, 529, 643 *A.*2d 972 (1994).

We affirm the dismissal of the defamation claim substantially for the reasons set forth in the opinion of the Appellate Division. First, the Appellate Division properly concluded that

Voorman–Fish's letter, which contained only statements of facts that were true, was not defamatory. As the Appellate Division explained:

> Voorman–Fish's letter contained no language expressly or impliedly exposing plaintiff to ridicule or otherwise attacking her reputation.... The letter simply says that her complaints were investigated and 'to date' Voorman–Fish could find no substantiation and thus no reason to continue the investigation, but requested plaintiff to provide more information if she had any. We hardly see how this defames plaintiff. Moreover, the February 14 letter was not false; it accurately reported the results of defendants' investigation.
>
> [307 *N.J.Super.* at 303, 704 *A.*2d 988.]

We also agree with the Appellate Division's conclusion that the co-workers' letters merely stated the co-workers' opinions. "[O]pinion statements generally have received substantial protection under the law.... Only if a reasonable factfinder would conclude that the statements imply reasonably specific assertions of fact will the harm be redressable." *Ward, supra,* 136 *N.J.* at 531, 643 *A.*2d 972. As the Appellate Division found:

> In their own letters, the co-employees expressed their opinions that plaintiff's accusations against Fromm and Contini were unfounded and they declared their unwillingness to work with plaintiff. These letters were expressions of opinion concerning plaintiff's good faith and made no statements of fact about her.
>
> [307 *N.J.Super.* at 303–04, 704 *A.*2d 988.]

The effect of the Appellate Division's judgment was to render moot several issues pertaining to damages and counsel fees. 307 *N.J.Super.* at 281, 704 *A.*2d 988. Our partial reversal of the Appellate Division's judgment requires that court now to consider those issues.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded to the Appellate Division.

*For affirmance in part; reversal in part; remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—none.