**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2132-17T1

MEG YATAURO,

     Plaintiff-Respondent,

v.

STATE OF NEW JERSEY and
GARY M. LANIGAN,

     Defendants-Appellants,

and

JUDY LANG and MARK FARSI,

     Defendants.

_____

        Argued October 29, 2019 – Decided December 2, 2019

        Before Judges Fisher, Gilson and Rose.

        On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1901-14.

        John D. North argued the cause for appellants (Greenbaum, Rowe, Smith & Davis LLP, attorneys; John D. North, Jemi G. Lucey and Maja M. Obradovic, of counsel and on the briefs).

Heidi R. Weintraub argued the cause for respondent (Heidi Weintraub & Associates, LLC, attorneys; Heidi R. Weintraub and Erica Domingo, of counsel and on the brief).

PER CURIAM

Plaintiff Meg Yatauro was employed by defendant Department of Corrections (DOC) as a prison administrator. Following a demotion, plaintiff commenced this action against the DOC and the individual defendants – including DOC Commissioner Gary M. Lanigan, DOC Chief of Staff Judy Lang, and DOC Deputy Commissioner Mark Farsi – under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14, claiming she blew the whistle on certain improprieties. The trial judge determined that four of plaintiff's many alleged whistleblowing claims qualified under CEPA and, at the conclusion of a twelve-day trial, a jury found defendants DOC and Lanigan (hereafter "defendants") violated CEPA and awarded plaintiff $1,000,000 in damages for her emotional distress and economic losses. After the denial of defendants' motions for a judgment notwithstanding the verdict or a new trial, and after the trial judge awarded attorneys' fees to plaintiff, defendants appealed.

In this appeal, defendants argue[1]

_____

[1] We have omitted the subparts of these points for brevity's sake.

I. THE TRIAL COURT ERRED IN DENYING THE STATE DEFENDANTS' MOTION FOR JNOV BECAUSE YATAURO FAILED TO IDENTIFY ANY LAW, RULE, OR AUTHORITY THAT PRESCRIBES A STANDARD OF CONDUCT THAT WAS ALLEGEDLY VIOLATED BY THE NJDOC; AND NONE OF THE WHISTLEBLOWING EVENTS INVOLVE UNLAWFUL CONDUCT, POLICIES, OR PRACTICES OF THE EMPLOYER AS REQUIRED BY N.J.S.A. 34:19-3([a]) AND ([c]).

II. THE TRIAL COURT ERRED IN DENYING MOTIONS FOR JNOV AND A NEW TRIAL BECAUSE THE RELEVANT EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE VERDICT AND THERE COULD BE NO CONFIDENCE THAT THE VERDICT WAS NOT THE RESULT OF THE JURY BEING INFLAMED AND MISLED BY THE EXCLUDED EVIDENCE.

III. THE TRIAL COURT ERRED IN DENYING THE STATE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND SUBSEQUENT MOTION IN LIMINE BECAUSE EVEN ACCEPTING AS TRUE ALL EVIDENCE SUPPORTING YATAURO'S CLAIM, THERE WAS NO RETALIATION.

We find no merit in these arguments and affirm.

I

A

Plaintiff began working for the DOC in civil service positions in 1984. Nineteen years later, plaintiff was promoted to assistant superintendent of Northern State Prison, a non-civil service position. When she married a captain

3

at Northern State Prison, plaintiff was transferred to Mid-State Correctional Facility, which housed sex offenders. She remained Mid-State's assistant superintendent for two years before being transferred to Central Reception and Assignment Facility, an intake facility, where she was promoted to associate administrator.

In March 2010, Lanigan became the DOC Commissioner. A few months later, he selected plaintiff to be the administrator of the Adult Diagnostic and Treatment Center (ADTC). In May 2012 – approximately six months after what the parties refer to as the SOG[2] search at the ADTC, see n. 3, below – plaintiff was transferred to the Albert C. Wagner Youth Correctional Facility (Wagner).

In 2013, either due to retaliation – as plaintiff contended – for her whistleblowing activities regarding events that occurred while she was Wagner's administrator, or because of her lack of competence or insufficient dedication to her role at Wagner – as defendants asserted – plaintiff was demoted to a civil service position. She resigned and commenced this CEPA action in 2014.

B

In seeking to prove her CEPA claim, plaintiff offered evidence of numerous whistleblowing incidents. At trial, the judge determined that of the

_____

[2] Special Operations Group.

 A-2132-17T1

many alleged whistleblowing incidents, only the four that occurred in late 2012 and early 2013 qualified as whistleblowing activities; he found the others were too remote in time from the adverse employment action in May 2013. One of the events that was described at length at trial, but ultimately excluded from the jury's consideration was the SOG search.[3]

---

[3] In October 2011, a routine ADTC search uncovered a child's scissors among an inmate's personal property. Apparently, Special Treatment Unit residents were permitted to use scissors as part of the facility's "hobby" program. That program was temporarily closed, and Lanigan and Farsi directed plaintiff to immediately confiscate all scissors. Plaintiff felt inmates would voluntarily forfeit scissors because sex offenders were more "sophisticated" and "educated" than the average inmate, so she directed her staff to inform inmates they should forfeit their scissors; hundreds were voluntarily surrendered. Nevertheless, on November 3, 2011, Farsi ordered approximately one hundred of his SOG officers to search the ADTC for additional scissors. A day later, plaintiff received numerous inmate remedy forms and was informed by staff of other inmate complaints concerning property destruction, verbal abuse, and the indignity of being made to stand naked for long periods. Plaintiff reported this to Director of Operations Michelle Ricci, and requested an investigation. Four inmates had claimed they suffered physical abuse during the search and plaintiff sent SID Investigator Erica Madden to look into the situation. Madden interviewed one inmate who recanted, but she refused to interview the other three because she did not want to work overtime; plaintiff reported this to Madden's supervisor, who conferred with the SID chief who responded that unless "an eye [was] hanging out of an inmate socket," no overtime should be incurred. In the next few days, plaintiff received another 100 or so inmate referral forms, but no SID investigator viewed them; plaintiff complained to Ricci about the lack of an investigation but later learned an investigation, about which she was not informed, had already begun. Farsi also told plaintiff that if any wrongdoing was discovered about the SOG search, it would be her responsibility despite the fact that SOG was under Farsi's control. Following

(continued)

A-2132-17T1

(1)

The first of the four alleged whistleblowing events that the judge allowed the jury to consider concerned plaintiff's report to her supervisor, Director of Operations Michelle Ricci, that Kevin Bolden, the Chief of the Special Investigations Division (SID), had managed to have his Trenton office painted sage green despite Ricci's earlier rejection of that request. This circumstance was of concern to plaintiff because she had been reassigned to Wagner; Bolden had a close friend, Sergeant Adrian Ellison, approach Kenneth Budden, a Wagner employee, and asked Budden to order the sage green paint and have it paid out of the Wagner budget at a time Wagner had its own urgent need for repairs. Plaintiff learned of this and reported it to Ricci.

(2)

The second incident was similar. Superstorm Sandy caused damage to the heating system in Wagner's maintenance building. Plaintiff authorized Budden's use of a State credit card to rent equipment and purchase materials so that a new

---

receipt of citizen complaints, plaintiff notified the inmate ombudsman, who interviewed sixty inmates and prepared a report that resulted in a federal subpoena. Plaintiff wrote a memo to Ricci and filed a report in December 2011 detailing aspects of the SOG search. Despite extensive testimony at trial about the SOG search, the judge found the circumstances too remote in time from plaintiff's 2013 demotion and gave the jury a curative instruction not to consider it.

A-2132-17T1

steam line could be run to the building. While working on this project, Budden made additional unauthorized credit card purchases and, without plaintiff's authorization, permitted maintenance staff to work overtime. Following an investigation, plaintiff determined that Budden and another employee, who supervised Wagner's accounts, had violated prison policy by misusing funds; both were removed from their positions.

(3)

The third incident reported by plaintiff involved Ellison, who, as noted above, managed to obtain from Wagner the sage green paint for Borden. In December 2012, Ellison appeared in a nail salon where the wife of Sergeant Robert Cermak, who was then assigned to Wagner, worked. While receiving a manicure, Ellison apparently wanted to display for Cermak's wife the extent of his power in the DOC system by calling the Wagner operations unit to inquire about Cermak's work schedule. After the call, he said to Cermak's wife, "See, I told you I know people. You know I know people in high places."

(4)

The fourth incident relates to the third. Cermak filed a complaint about the nail salon incident, and plaintiff forwarded the complaint to Leila Lawrence, the DOC ethics officer. In January 2013, Lawrence emailed plaintiff to advise

7

that although Ellison's conduct "may touch upon ethics," it did not violate the New Jersey Uniform Ethics Code because Ellison did not use his official position to secure unwarranted privileges. Plaintiff replied and vehemently disagreed with Lawrence's interpretation of the Code, arguing that a violation can occur when one uses a position for privileges "whether or not for pecuniary gain."

C

By early 2013, Lanigan and Farsi believed plaintiff had failed to fulfill her duties and convened a committee, which recommended that plaintiff be demoted. Lanigan, instead, decided to simply monitor the situation.

On Sunday, March 31, 2013 – Easter Sunday – a fight broke out in Wagner's mess hall. Plaintiff was emailed but did not respond; without direction, a Wagner official cancelled visits for the remainder of the day. While plaintiff was still out of contact, the DOC chief of staff was advised of the violence and the decision to cancel visits. By early evening, plaintiff learned of these events and finally called in; she arrived later in the evening.

Plaintiff acknowledged it was wrong of her to be out of contact on Easter Sunday. On April 1, 2013, the chief of staff reprimanded plaintiff, explaining

that plaintiff's actions on Easter were not acceptable and demonstrated plaintiff was not "competent to keep the jail stable."

A second committee was convened and recommended plaintiff's demotion to a civil service position. Lanigan found plaintiff's actions to be "egregious" and demonstrated a lack of commitment. At trial, he distinguished plaintiff from other administrators at more violent prisons – on whose watch stabbings, murders and escapes had occurred – because unlike those other administrators, plaintiff did not accept constructive criticism. In May 2013, plaintiff was told of her demotion to a civil service position, which resulted in a $26,000 reduction of her annual salary.

Plaintiff alleged that severe depression followed. In January 2014, she took full-time leave under the Family Medical Leave Act and, in March 2014, she retired. She did not seek new employment.

II

Plaintiff filed this CEPA action in May 2014, alleging the actions taken by her employer and supervisors were in retaliation for her whistleblowing activities. After a lengthy trial, plaintiff received a favorable jury verdict.

Defendants appeal, asserting error in the denial of their post-trial motions, their summary judgment motion, and their in limine motion. Defendants'

A-2132-17T1

contentions mainly argue the alleged whistleblowing events did not constitute the type of employer or co-employee conduct encompassed by CEPA or were not of sufficient gravity to support relief. Defendants also argue that there was no evidence of retaliation.

CEPA – via the various terms of N.J.S.A. 34:19-3 – prohibits an employer from taking "any retaliatory action" against an employee in certain circumstances. One of those is when the employee "[d]iscloses or threatens to disclose" to a supervisor or a public body an employer's "activity, policy or practice" that the employee "reasonably believes":

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation . . . .
>
> [N.J.S.A. 34:19-3(a).]

CEPA also permits recovery for retaliation when, as described in subsection (c) of N.J.S.A. 34:19-3, an employee "objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes" fits any one of three circumstances. The first two, which appear in subparts (1) and (2) of N.J.S.A. 34:19-3(c) are identical to subsection (a)'s first two subparts; the third is when the employee objects or refuses to participate in an activity, policy or

practice that the employee reasonably believes "is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J.S.A. 34:19-3(c)(3).

In determining what constitutes a prima facie case, the Supreme Court has recognized not only the employee's "reasonabl[e] belie[f]" about the employer's violation of law, rule, regulation or clear policy,  but also that there must be shown "an adverse employment action" and a "causal connection" between the whistleblowing and the adverse employment action.  Yurick v. State, 184 N.J. 70, 78 (2005).

CEPA is a remedial statute and should be liberally construed to effectuate its social goal of protecting employees from retaliation when they report workplace misconduct.  Lippman v. Ethicon, Inc., 432 N.J. Super. 378, 380 (App. Div. 2013), aff'd, 222 N.J. 362 (2015).  Our Supreme Court has emphasized that the CEPA plaintiff need not show the employer actually violated the law, only that the plaintiff reasonably believed the employer was violating a law or a clear mandate of public policy.  Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003).  In interpreting the "reasonable belief" element, we recognize that CEPA was not intended to "make lawyers out of conscientious employees."  FOP v. City of Camden, 842 F.3d 231, 240 (3d Cir. 2016).

To sustain a claim pursuant to N.J.S.A. 34:19-3(c)(3) – CEPA's protection from retaliation for objecting to a practice that is incompatible with a "clear mandate of public policy" – a plaintiff must prove: a reasonable belief of actions incompatible with a clear mandate of public policy; an act of whistleblowing; an adverse employment action was taken against the employee; and a causal connection between the whistleblowing activity and the adverse employment action. Hitesman v. Bridgeway, Inc., 218 N.J. 8, 29 (2014). To establish a practice is incompatible with a clear mandate of public policy, the plaintiff must identify an authority "that provides a standard against which the conduct of the defendant may be measured." Id. at 33. In Hitesman, the Court declared, as it had ten years earlier in Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 444 (2004), that a "clear mandate of public policy" conveys

> a legislative preference for a readily discernible course of action that is recognized to be in the public interest. A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that, under [CEPA], there should be a high degree of public certitude in respect of acceptable [versus] unacceptable conduct.
>
> [218 N.J. at 34 (citing Maw, 179 N.J. at 444).]

When a plaintiff asserts a subsection (c)(3) claim, the trial judge must determine – before sending the matter to the jury – whether there is a substantial nexus

12

between the complained-of conduct and a clear mandate of public policy. Id. at 31. By complying with the requirement to establish each element of a CEPA claim, courts distinguish an employee's objection to or reporting of an employer's illegal or unethical conduct from a routine dispute in the workplace regarding the relative merits of internal policies and procedures. Ibid.

In their first point, defendants argue that the judge erred in denying their motion for a judgment notwithstanding the verdict. Rule 4:40-2 requires that a trial judge accept as true all the evidence that supports the party defending against the motion and must give all legitimate inferences to that party. If reasonable minds could differ, the motion should be denied. Our standard of review of a trial court's decision on such a motion is whether "given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly appears that there was a miscarriage of justice under the law." Dolson v. Anastasia, 55 N.J. 2, 6-7 (1969).

In their second point, defendants argue that the judge erred in denying their motion for a new trial. Rule 4:49-1(a) provides that such a motion shall be granted if, considering "the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears there was a miscarriage of justice under the law."

Defendants' arguments on both these points largely center on their claim that plaintiff failed to establish a CEPA claim because – as to the four whistleblowing events the jury was permitted to consider – she provided no "law, regulation or authority" that could establish a reasonable belief that defendants acted illegally or unethically. Claiming plaintiff failed to establish a standard against which defendants' conduct could be measured, defendants argue that the jury was left to speculate,[4] when, in their view, plaintiff's complaints related only to the manners or behaviors of other employees.

To be sure, the "clear mandate of public policy" referenced in N.J.S.A. 34:19-3(c)(3) conveys "a legislative preference for a readily discernible course of action that is recognized to be in the public interest" and that may be viewed as "an analog" to a constitutional provision, statute or rule so there may be "a high degree of public certitude" with respect to what is acceptable and unacceptable workplace conduct. Maw, 179 N.J. at 444. With the exception of the fourth event, we reject defendants' argument that the complained-of conduct did not rise to this level. A jury could certainly conclude that the misuse of

---

[4] In support of their argument, defendants cite two unpublished cases. An unpublished opinion does not constitute precedent nor is it binding upon the appellate court. R. 1:36-3.

public funds and misuse of power by a corrections officer is contrary to the public interest.

Indeed, in at least three of the four whistleblowing incidents, plaintiff provided sufficient evidence of a reasonable belief that defendants acted unethically or illegally when she objected. The first incident was plaintiff's reporting about the paint Bolden used for his Trenton work space that was charged against Wagner's budget. Plaintiff had a reasonable belief that Bolden was violating a clear mandate of public policy, inasmuch as the evidence supported her belief that Bolden misused public funds in this manner for his own benefit. Defendants argue there was no misuse of funds, only mis-budgeting, and that Bolden's desire to circumvent Director of Operations Ricci was not reflective of DOC policies. But a jury could legitimately find from this evidence that plaintiff had a reasonable belief that Bolden misused public funds by ordering the paint using the Wagner budget; indeed, it is hard to view it any other way. It was not necessary for plaintiff to cite an actual law that Bolden violated because reasonable persons would agree that public officials should not misuse public funds.

The nail salon incident was also adequately supported and of sufficient weight. Ellison's behavior in the nail salon was arguably a clear mandate of

15

public policy: that DOC investigators not misuse their positions to intimidate members of the public. Even so, it is not only plaintiff that possessed this view. Our courts have recognized a high standard of behavior for police and correctional officers. See In re Phillips, 117 N.J. 567, 577 (1990) (recognizing that good judgment is required of an armed police officer); Hartmann v. Police Dep't of Vill. of Ridgewood, 258 N.J. Super. 32, 40 (App. Div. 1992) (holding there is "implicit standard of good behavior which devolves upon" police officers); Moorestown Twp. v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965) (observing that police officers are "constantly called upon to exercise tact, restraint and good judgment in [their] relationship with the public"). And we find no significance in defendants' argument that the nail salon complaint was made by Cermak and that he, not plaintiff, was the whistleblower. That plaintiff gave voice and added weight to Cermak's complaint makes her a whistleblower as well.

Defendants also argue that the trial judge specifically stated that the steam pipe alteration and the nail salon incident fell under reporting, pursuant to N.J.S.A. 34:19-3(a) and not N.J.S.A. 34:19-3(c), so that the complained-of conduct would need to be an act attributable to the employer, not a co-employee.

In fact, the trial judge did not separate the four incidents in instructing the jury,[5] and defendants did not object to the judge's failure to call for a jury verdict on each of the four incidents. Consequently, we cannot tell whether the jury may have determined that the nail salon event was actionable as reporting or objecting or, for that matter, whether the jury found this incident actionable at all.

The third incident the jury considered was plaintiff's complaint about the misuse of funds in the steam pipe incident. Plaintiff ordered an investigation and ultimately, as a result of plaintiff's report, Budden (of Wagner's maintenance department) and Shea (Wagner's supervisor of accounts) were terminated.

---

[5] The judge combined his instructions about reporting and objecting in the following way:

> Plaintiff must show that it's more likely than not that she reasonably believed that one or more of the aforementioned activit[ies] which she disclosed to a supervisor and/or which she objected to was either in violation of a law, rule, or regulation, . . . [o]r that it was incompatible with a clear mandate of public policy concerning public welfare.

> She must also show that she actually blew the whistle by disclosing to a supervisor and/or objecting to one or more of the aforementioned activities . . . .

A-2132-17T1

Again, the misuse of public funds is inconsistent with a clear mandate of public policy and plaintiff objected to this practice.

Defendants argue that plaintiff's objecting to the misbehavior of her subordinates should not be considered a CEPA whistleblowing event. According to defendants, if this is permitted, any supervisor who investigates misbehavior of a subordinate would have a CEPA claim if the supervisor was later demoted or disciplined. In this regard, plaintiff persuasively relies on Lippman v. Ethicon, Inc., 222 N.J. 362, 384 (2015), for the notion that an employee does not need to be "acting outside of [the employee's] usual duties to merit protection" from retaliation. Plaintiff also relies on Higgins v. Pascack Valley Hospital, 158 N.J. 404, 419-23 (1999), for the proposition that a CEPA violation can occur when an employee reports the wrongdoing of a co-employee, even when that wrongdoing is not sanctioned by the employer. The Higgins Court reasoned that an employee's misconduct can also threaten the public health, safety and welfare, and sometimes only a co-employee can bring that wrongdoing to the attention of the employer. Id. at 421. Even though plaintiff was Budden and Shea's superior, she brought to the DOC's attention this misuse of public funds. We agree that investigating and reporting the steam pipe incident was sufficient evidence of a whistleblowing activity.

A-2132-17T1

The fourth incident the jury considered occurred when plaintiff disagreed with Lawrence's opinion about whether Ellison's nail salon conduct constituted an ethics violation. In support of their argument, defendants cite Blackburn v. United Parcel Service, Inc., 3 F. Supp. 2d 504, 515-17 (D.N.J. 1998), aff'd, 179 F.3d 81 (3d Cir. 1999), where the district court held that questioning certain activities and expressing an opinion is not, by definition, whistleblowing, and that a plaintiff must show that a law would be violated if the facts, as alleged, are true. Plaintiff distinguishes Blackburn because there, the employee conveyed concerns, while here plaintiff strenuously objected to Lawrence's interpretation of the ethics code. But it seems to us that the plaintiff in Blackburn also strenuously disagreed with his employer. Ibid.

As already noted, "a clear mandate of public policy" conveys "a legislative preference for a readily discernible course of action that is recognized to be in the public interest" and one that possesses "a high degree of public certitude in respect of acceptable versus unacceptable conduct." Hitesman, 218 N.J. at 34. The plaintiff's belief must be such that "a reasonable layperson would conclude that illegal activity was going on." Blackburn, 3 F. Supp. 2d at 515 (citing Young v. Schering Corp., 275 N.J. Super. 221, 233 (App. Div. 1994)). In applying this standard, we agree with defendants that this fourth alleged

19

whistleblowing activity was too insubstantial to support the CEPA claim. Plaintiff and Lawrence merely had a difference of opinion as to the application of the ethics rules to the nail salon incident; that disagreement doesn't satisfy Hitesman's requirements. Even though defendants are correct that this fourth incident was legally insufficient, they also recognize that to succeed in obtaining relief from the verdict they need to run the table on all four of the alleged whistleblowing events. That is, the jury's verdict sustaining plaintiff's CEPA claim – absent a determination, which defendants urge, that the bulk of insufficient whistleblowing activities tainted the trial or produced an unfair result, which we discuss in Section IV of this opinion – may be sustained on any one of the four alleged events. So, as defendants concede, it does not benefit them even though we agree that the fourth incident was legally insufficient, since the other three were.

III

Defendants argue that the trial judge erred in denying their motion for judgment notwithstanding the verdict because they believe (a) there could be no confidence the jury was not misled by the evidence about the excluded whistleblowing events, and (b) the fact that the first committee did not demote plaintiff precluded a finding of retaliation. We reject both these contentions.

20

A

Defendants contend that the jury was allowed to hear evidence of alleged whistleblowing activities that, ultimately, the judge concluded could not support a CEPA claim. In fact, defendants argue that the evidence adduced at trial included ten hours of testimony from plaintiff, the bulk of which pertained to the SOG search, and, moreover, that was the only evidence that suggested a conflict between plaintiff and Lanigan or Farsi. According to defendants, the jury must have disregarded the court's curative instructions and considered the evidence that was ruled out, because it found a CEPA violation even though the four permitted whistleblowing events did not suggest a conflict between plaintiff and the decision-makers.

Defendants rely on Demers v. Snyder, 282 N.J. Super. 50, 57-58 (App. Div. 1995), which held that "curative instructions are not always palliative or sufficient to mitigate the damage caused by improper comment" especially where counsel continues to refer to the excluded evidence. They rely, as well, on Diakamopoulos v. Monmouth Medical Center, 312 N.J. Super. 20, 37 (App. Div. 1998), where we recognized that a trial is "a dynamic organism" that can be "desensitized by too much error or too much curative instruction." We continue to adhere to those concepts but we do not view them as requiring our

21

intervention. In both cases, the other side continued to inject the excluded information into the trial, prompting our recognition that sometimes the error is too egregious or overwhelming to be overcome by a cautionary instruction. The premise for that approach is not present here. Once the earlier whistleblowing activities were found too remote in time, they were not urged again.

We also find that Verni ex rel. Burstein v. Stevens, 387 N.J. Super. 160, 187-93 (App. Div. 2006), upon which defendants also rely, does not compel a different result. Undoubtedly, as we recognized in Verni, there are times when no curative instruction can make the jury unhear testimony. Ibid. We there held that the admissible evidence was less than overwhelming and, so, concluded there could be no confidence that the jury could evaluate the relevant evidence in a dispassionate manner because the excluded evidence had the clear capacity to mislead and inflame the jury. Ibid.

We find no reason for viewing the present matter in the same way that we viewed Verni and the other cases on which defendant relies. Defendants never objected to the curative instructions or sought additional instructions; they did not move for a mistrial or contend the curative instructions were not sufficient to undo the testimony about the alleged whistleblowing activities that had been excluded. And, after close examination of the record, we are satisfied that there

A-2132-17T1

was nothing misleading or inflammatory about what was presented to the jury to call into question whether the jury complied with the judge's instructions. In short, there is nothing about the trial that would suggest a departure from the presumption that the jury followed the judge's instructions. State v. Manley, 54 N.J. 259, 271 (1969); Belmont Condominium Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 97 (App. Div. 2013).

B

We also reject defendants' argument that – once the earlier alleged whistleblowing activities were removed from the jury's consideration – the jury could only speculate on the retaliation question. In this regard, defendants allude to the significant amount of time spent at trial on the SOG search. They assert that the only evidence of a conflict between plaintiff and Lanigan or Farsi arose in the context of the SOG search and, without that evidence, the jury could only speculate on their animus toward plaintiff. We disagree.

It may be that there was no direct evidence that the four whistleblowing events reached those who decided to demote plaintiff, but there was other evidence from which the jury could infer that they learned of her whistleblowing and retaliated. DOC executives regularly met and it is likely that these incidents were discussed. SID was in Lanigan's chain of command, so it was inferable

23

that Lanigan knew about matters involving Ellison and the SID investigation into the steam pipe incident. In fact, Lanigan conceded he had some familiarity with those incidents, but claimed he did not know of plaintiff's role in them.

We reject the argument that the jury was left to speculate. The jury was entitled to make a credibility determination as to whether the decision-makers knew of the whistleblowing activities despite their denials. We view the question as one where individuals "of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury." Ferdinand v. Agric. Ins., 22 N.J. 482, 494 (1956); see also Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000) (holding that when "[e]xamining whether a retaliatory motive existed, jurors may infer a causal connection based on the surrounding circumstances"); D'Amato by McPherson v. D'Amato, 305 N.J. Super. 109, 115, (App. Div. 1997) (similarly recognizing that a trier of fact "is free to weigh the evidence and to reject the testimony of a witness, even though not directly contradicted, when it . . . contains inherent improbabilities or contradictions which alone or in connection with other circumstances in evidence excite suspicion as to its truth" (quoting In re Perrone's Estate, 5 N.J. 514, 521-22 (1950))). We agree with the trial judge that the record contained evidence of

24

surrounding circumstances that could support the jury's finding of a nexus between plaintiff's whistleblowing and her demotion.

We are also not persuaded to a different result based on defendants' argument that after the first committee recommended to demote plaintiff, Lanigan decided to give her a second chance, and therefore his intention was not to retaliate, because he had the perfect opportunity to demote on the earlier occasion and chose not to. Defendants also argue that Lanigan introduced new individuals (members of the first and second committees) to make recommendations who were purportedly unaware of the incidents involving plaintiff's performance. Plaintiff responds that the committees were a pretext for retaliation, given that the individuals on the committees did not have firsthand knowledge of what was going on at Wagner. Rather, the committee members reported directly to Lanigan.

The fact that Lanigan did not demote plaintiff after the first committee recommendation certainly lends support for the argument of a lack of retaliation. But it does not foreclose the likelihood that there was retaliation. This was a fact-sensitive question that was for the jury to decide.

IV

Defendants also argue that the judge erred in not granting their motion for summary judgment or their in limine motion. The latter sought exclusion of evidence about the SOG search that the judge ultimately determined at trial was insufficient to support a whistleblowing claim.

We reject defendants' argument about the in limine motion. To be sure, such motions may be directed toward the admission of evidence and judges retain the discretion, in appropriate cases, to rule on the admissibility of evidence prior to the start of a trial. State v. Cordero, 438 N.J. Super. 472, 484 (App. Div. 2014). Defendants argue that if their in limine motion had been granted, the jury would not have heard evidence of other alleged activities that the judge ultimately held did not constitute whistleblowing activities. That is certainly true, but that doesn't mean the judge abused his discretion in denying the in limine motion. The judge may have viewed the trial as necessary for the development of the record that would assist him in determining the admissibility of the SOG search or the claim that plaintiff's transfer to Wagner was retaliation for her requesting an investigation into the SOG search. We find no abuse of discretion in the judge's decision to leave such questions for further consideration once all relevant testimony on those subjects had been aired at trial.

To the extent defendants may have posed other arguments in their appeal that we have not specifically addressed, we find those arguments to be of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION